**Patricia Ray BROWNLEE, Plaintiff,**

v.

**GAY AND TAYLOR, INC., and Equifax, Inc., Defendants.**

**No. 83–1070–K.**

United States District Court,
D. Kansas.

June 28, 1985.

Supplemental Memorandum and Order
Feb. 3, 1986.

had no personal involvement with the action. We do, however, agree with his argument.

James S. Phillips, Jr., Wichita, Kan., for plaintiff.

Susan Selvidge, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This is a sex discrimination in employment suit. Plaintiff claims she was denied equal pay for equal work in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), and

that she was discriminated against with respect to her compensation and was wrongfully demoted in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) & (2). This matter is now before the Court on the motion of defendant Gay and Taylor, Inc. for summary judgment. For the reasons stated below, the motion must be overruled.

Plaintiff began work as a bookkeeper for Kansas Claims Service in 1971. The defendant, Gay & Taylor, Inc., an insurance adjusting firm, purchased Kansas Claims Service effective as of August 1, 1973. Plaintiff continued employment with Gay & Taylor. Plaintiff was promoted to Assistant Manager in 1975, was promoted to Supervising Branch Manager III on March 21, 1977, and was promoted to Supervising Branch Manager IV on October 1, 1977. In mid-1978, Gay & Taylor reorganized the management structure of the company, and plaintiff was reclassified from the title of Supervising Branch Manager IV to the title of Branch Manager II. At the end of 1979, Gay & Taylor again reorganized their management structure, reinstituted middle-level management, and used the title District Manager for managers who managed more than one office. Plaintiff's title was changed from Branch Manager II to District Manager III. Plaintiff received salary increases throughout this time period. Gay & Taylor had a written Salary Administration Program which set forth the job descriptions and salary ranges for the various positions within the company. Plaintiff's salary was always adjusted to be within the proper salary range whenever she received a promotion or reclassification, although her salary was generally at the lower end of the salary range.

In 1980 and 1981, all managers under John Robertson, the Regional Vice President supervising plaintiff and others, were given a profit goal of .900 mils, which means a profit of 10 cents on the dollar, or $1.00 in revenue for each $0.90 of expense. Plaintiff failed to meet this profit goal in 1980 and early 1981. Mr. Robertson, on January 9, 1981, wrote plaintiff a memo advising her that he would not accept the type of performance that her district showed during 1980, that he would measure her performance in mid-March against the goals he set out in the memo, and that he would make recommendations at that time. In June 1981, plaintiff had failed to meet the profit goals set forth in the memo, and she was demoted from District Manager III to Adjuster III with a concurrent salary reduction. Plaintiff resigned from Gay & Taylor on July 15, 1981.

Defendant Gay & Taylor moves for summary judgment on plaintiff's claims of discriminatory undercompensation under the Equal Pay Act and Title VII and discriminatory demotion under Title VII. Defendant argues, with respect to the Equal Pay Act claim, that the plaintiff has no basis for comparison of her salary with that of any other employee within the "establishment" and that the defendant's salary program is exempt under the Act, and therefore summary judgment on the Equal Pay Act claim is appropriate. Defendant argues, with respect to the plaintiff's Title VII compensation claim, that the defendant's salary program is exempt and therefore summary judgment on this claim is appropriate. Defendant argues, with respect to the Title VII demotion claim, that plaintiff fails to present a *prima facie* case because she was not qualified to retain her position and therefore summary judgment on this claim is appropriate. Defendant finally argues that the state tort claim should be dismissed for lack of pendent jurisdiction.

The Court first addresses the defendant's argument that there was no other employee in a comparable position within the "establishment" with whom Ms. Brownlee could be compared with respect to equal pay for equal work. Defendant argues that as a matter of law, the term "establishment" is a distinct physical place of business. Defendant contends as a matter of law that the Wichita office is the establishment for the purposes of this lawsuit. Defendant argues that because no other employee held a position comparable to that of Ms. Brownlee within the Wichita

office, there is no valid comparison within the establishment. The defendant argues that from 1977 through 1981 there was no employee in the Wichita office who held a position comparable to Ms. Brownlee. Defendant notes that Ms. Brownlee was the only Assistant Manager in the Wichita office for the first three months of 1977, and thereafter she was the only Manager of the office. Consequently, the defendant argues, no other employee in the Wichita office performed "equal work" and therefore the plaintiff fails to present a case of denial of equal pay for equal work within the establishment under the Equal Pay Act.

The plaintiff, on the other hand, argues that all of the district offices of Gay & Taylor in different cities nationwide constitute the "establishment" for the purposes of this lawsuit. The plaintiff contends that the salary of Ms. Brownlee must be compared to the salary of other managers of district offices in various other cities. Plaintiff contends that Gay & Taylor is a centrally organized corporation, that the central administration devised the salary administration manual, the central administration defines job descriptions and salary ranges without respect to geographic location, that the central administration sets and reviews salaries of all district managers, and that the job function of the district manager is the same without respect to geographic location.

There is a solid line of cases holding that an "establishment" within the meaning of the Equal Pay act is defined as a distinct physical place of business, and is not an entire business which may include several separate places of business. *Mitchell v. Bekins Van & Storage Co.,* 352 U.S. 1027, 77 S.Ct. 593, 1 L.Ed.2d 589 (1957); *Alexander v. University of Michigan-Flint,* 509 F.Supp. 627 (E.D.Mich.1980).

Nonetheless, there is a trend in the law wherein an "establishment" includes all places of business of one corporation or a multi-location employer, and is not restricted to a single distinct building or place of business. *Marshall v. Dallas Indepen-*

*dent School Dist.,* 605 F.2d 191 (5th Cir. 1979); *Brennan v. Goose Creek Consolidated Independent School Dist.,* 519 F.2d 53 (5th Cir.1975); *Grumbine v. United States,* 34 F.E.P. 847 (D.C.1984). The Court is persuaded by the reasoning in *Brennan v. Goose Creek* and in *Grumbine v. United States.*

*Brennan* presented the issue of whether a school district composed of various school buildings was one establishment or whether each school building represented a single establishment. The court in *Brennan* reasoned that a central authority was responsible for the employees' employment and wages, and that there was no difference in the working conditions at the 11 schools of the school district. The court in *Brennan* held that the entire school district was a single establishment and rejected the argument that each school building constituted a single establishment.

The court in *Grumbine v. United States, supra,* comprehensively addressed the factors to be considered in determining whether a multi-location employer constituted a single establishment, or whether each geographic location of the employer constituted a single establishment. The court in *Grumbine* addressed the issue of the meaning of the term "establishment" under the Equal Pay Act for the purposes of employment in the federal government. Although *Grumbine* involved the Civil Service classifications of employment in the federal government, this Court believes the factors considered by that court are applicable to private sector employers. The court in *Grumbine* reasoned that the issue of equal pay for equal work should be determined under a standard of employment function rather than that of mere geography. The court found that three principal factors should be addressed with regard to function. These are the degree of centralized control by the executive office, the work performed, and the position description under which the plaintiff operated. The court noted in *Grumbine* that the head office regulated and controlled the regional offices and controlled the pay and

budget process for all the regions. Second, the court noted that the regional offices performed the same basic functions regardless of their size or location. Third, the court noted that the plaintiff in *Grumbine* was operating under a standard position description which was the same as that used for all other employees in a comparable position. The court in *Grumbine* therefore found that the plaintiff therein could be compared with similarly situated employees who performed the same functions although they may have been located in different geographic locations. In *Grumbine*, the court held that for purposes of the Equal Pay Act, the term "establishment" meant the Civil Service in its entirety, and an establishment was not confined to a single geographic location. The court noted that to confine the term "establishment" to a narrow geographic meaning would leave female employees, who had no counterpart in their particular office or plant in which they were located, wholly unprotected by the Equal Pay Act and would constitute a statutory construction which effectively vitiated the Act for an entire class of employees. The court did state, "It may also be that, for the reasons discussed above, the 'establishment' concept should not be given a narrow geographic focus where a private employer operates a highly centralized employment system. However, it is not necessary to decide that issue in this case, and the Court does not do so." *Id.* at 849 n. 15.

■ This Court is persuaded by the reasoning in *Grumbine* although the holding there was confined to comparison within the federal Civil Service employment. This Court finds it most reasonable to compare the pay of individuals performing the same or similar functions regardless of the geographic location where the employees work so long as there is central control of job descriptions, salary administration, and job assignments or functions. The Court agrees with the comment of the court in *Grumbine*, which stated, "It would hardly make sense to permit an employer to rely on a geographic 'establishment' concept in defense of unequal pay practices when that employer has itself adopted a uniform, non-geographic pay policy and system." *Id.* at 849. This Court recognizes that there are geographic-related factors that *do* affect the amount of salary paid to an individual working in that geographic location. For example, the cost-of-living index would properly be considered as a factor for different salaries in cities with differing cost-of-living indices. Some cities may be considered hardship areas, while others may be more attractive places to live. Some cities require greater time and distance in traveling to and from work. Where factors such as these logically affect the salary one should receive in a particular geographic area, there is reason to have differentials in salary scales based on geographic location. Nonetheless, where central supervision exists and where pay standards apply for an entire business entity regardless of where the employee is located, individuals should be compared on the basis of their employment function and not geographic location.

■ Therefore, this Court finds that the facts at this stage of the summary judgment motion present a question of fact as to whether the entire region should be considered as a single establishment. The Court is persuaded by the facts now presented that the regional offices of Gay & Taylor under the supervision of Mr. John Robertson are probably a single "establishment" for the purposes of the Equal Pay Act. For these reasons, the defendant's motion as to the Equal Pay Act claim is denied.

■ The Court considers next defendant's contention that the Gay & Taylor salary program is exempt under Title VII and the Equal Pay Act. The language of the Equal Pay Act exempts from its purview salaries made pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex...." 29 U.S.C. § 206(d)(1). These salary system defenses of the Equal Pay Act

apply in Title VII suits involving equal pay claims. *Gunther v. County of Washington*, 602 F.2d 882, 891 (9th Cir.1979). Gay & Taylor contends that its salary program is a merit system, a system which measures earnings by quantity or quality of production. Gay & Taylor contends that its salary system is therefore exempt from the purview of the Equal Pay Act and Title VII and therefore summary judgment in favor of defendant on plaintiff's compensation claims must be granted.

The plaintiff asserts that the mere existence of a formal merit system does not automatically foreclose a complainant's claim of unequal pay for equal work under the Equal Pay Act or discriminatory compensation under Title VII of the Civil Rights Acts of 1964. Ms. Brownlee asserts that the salary program was inconsistently and discriminatorily applied to her throughout her employment with Gay & Taylor. Ms. Brownlee contends that the Gay & Taylor salary administration program, allegedly measuring quantity or quality of production, was not the cause of the differential in her salary as compared with salaries paid to men in the same or similar positions. Ms. Brownlee alleges and presents supporting documents which show that she was consistently in the lower or middle range of the salary ranges for her various positions, whereas numerous male employees received greater salaries within their salary ranges.

■ The Court agrees that the mere presentation of a formal salary administration program will not foreclose an Equal Pay Act or Title VII case when there is evidence that supports an inference that the salary program may have been administered differently on the basis of sex. The evidence in the record at this stage presents a question of fact as to whether Ms. Brownlee's salary, which was consistently in the lower end of the salary range, was on the basis of her experience, quantity of production, and ability to meet corporate goals, or whether it was on the basis of her sex. Therefore, the defendant's motion for summary judgment as to the equal

pay claim under the Equal Pay Act and the discriminatory compensation claim under Title VII of the Civil Rights Acts of 1964 must be denied.

■ The Court next addresses the defendant's contention that plaintiff's Title VII claim of discriminatory demotion should be dismissed because she was not qualified as a matter of law. Gay & Taylor contends that Ms. Brownlee's failure to meet the profit goal of .900 mils in 1980 and early 1981 rendered her unqualified to continue in her position as manager of the Wichita office. Ms. Brownlee responds that there were other male managers who failed to meet the .900 mils profit goal, but that they did not receive a memo from Mr. Robertson conveying that their continued employment was contingent upon their ability to meet this profit goal. Ms. Brownlee contends that there must be a consistent application of criteria. That is, her failure to meet the profit goal cannot render her unqualified when male managers who failed to meet the same profit goal did not receive a similar probationary memo nor were they demoted or fired. The Court views the critical evidence on this issue as the affidavit of John I. Robertson, Exhibit A–2, defendant's August 17, 1984 memorandum in support of its motion for summary judgment, and the affidavits of Richard Teasdale and Gerald D. Jacober, Exhibits 10 and 13 attached to plaintiff's supplemental brief of December 26, 1984.

Mr. Robertson's affidavit states that Ms. Brownlee's performance was the worst of any district manager under his direction in 1980, that the second worst performance was that of Gerald Jacober, and the third worst performance was that of Richard Teasdale. Mr. Robertson stated that Ms. Brownlee received a written probationary memo setting her goals in writing, although the two male managers received no similar written goals. Mr. Robertson stated that Ms. Brownlee, Mr. Jacober, and Mr. Teasdale were all admonished regarding their poor performances in 1980.

Mr. Teasdale, who was the second worst performer according to Mr. Robertson, stated in his affidavit as follows:

My resignation from Gay and Taylor, Inc., in 1981, was completely voluntary. I was never asked to resign by anyone. I was *not* told by Mr. Robertson or anyone else in the company that unless my district had a certain mil factor or met production goals or met certain performance standards that I would be terminated or demoted. No such idea was even hinted at. Also since my resignation I have never heard that the performance of my district was considered poor or that my job was in jeopardy. I left Gay & Taylor, Inc. in order to start my own business which is a success. My resignation had nothing to do with my performance. Mr. Robertson did not set a personal production quota for me in 1980 and 1981. He did not lay down a rule which provided that I was required to produce so much revenue in the role of an adjuster. I was not instructed at any time by Mr. Robertson that the budget must be on track or that my district was required to score 90 or better on the audit or that I must undertake any other action in 1981 to avoid demotion or termination.

Gerald Jacober, who was the third worst performer according to Mr. Robertson, stated in his affidavit as follows:

My resignation from Gay and Taylor in 1981 was purely voluntary. It had nothing to do with the performance of my district. I was not informed by Mr. Robertson or anyone else in the company that unless I met certain goals (mil factors, production, etc) I would be demoted or terminated. No ultimatum was ever given me as was apparently the case of Pat Brownlee. I was not asked to resign. Nor did Mr. Robertson indicate to me that my performance was poor or might justify demotion or discharge. I left Gay and Taylor, Inc. in order to obtain a higher paying job. Mr. Robertson did not establish a personal production quota for me in 1980 and 1981. That is to say, I was not required

to produce ex amount of dollars as an adjuster in addition to my supervisory duties.

I was not instructed at any time that in order to avoid demotion or termination I had to have the district budget on track or have a score of 90 or better on the audit or had to meet any other performance standard.

Thus, this Court sees the affidavits of Messrs. Jacober and Teasdale as contrary to that of Mr. Robertson. The affidavits suggest that while Ms. Brownlee received a probationary memo and was instructed that her failure to meet the profit mil factor would result in demotion or termination, the two male managers who were the next poorest performing managers in the district did not receive similar memos or oral comments. This presents a question of fact as to whether there was a consistent application of criteria. That is, although Ms. Brownlee performed poorly in her district, other male managers who also performed poorly did not receive the same treatment as Ms. Brownlee. Moreover, the two male managers testified that there was no insinuation from Mr. Robertson that continued poor performance on their parts would result in demotion or termination. Thus, even if Ms. Brownlee was not "qualified" for her position, if Messrs. Teasdale and Jacober were also unqualified but they received no probationary notice or threat of demotion, then Ms. Brownlee may have been treated differently than the male managers. This evidence presents an inference that Ms. Brownlee may have been treated differently because of her sex rather than as a result of her poor performance.

Further, this Court cannot overlook the affidavit of Penelope Thompson, Ex. 1 attached to the plaintiff's November 14, 1984 memorandum in opposition to defendant's motion for summary judgment. Ms. Thompson was the manager of personnel in the Human Resources Department of the home office of Gay & Taylor, Inc. from July 1977 through April 1979. Ms. Thompson stated that she was familiar with the organizational structure and decision-mak-

ing processes of the company, that salary schedules were set by the home office and salaries were reviewed and approved by the home office. Ms. Thompson stated in her affidavit as follows:

> In my opinion there was a pattern of sex discrimination in salaries within the company. I informed the Vice-President of Human Resources (who was my supervisor) that the salary granted to Ms. Brownlee as a Supervisor Branch Manager was inequitable when compared to salaries of males who were performing duties which required equal skill, effort and responsibility, and which were performed under substantially the same working conditions. No action was taken by the home office to correct the inequity in Ms. Brownlee's salary. Ms. Brownlee should be compared in this case to all other supervising branch managers at her level nationwide. A comparison more limited would be misleading and inconsistent with the organizational structure and facts of this case. Gay & Taylor was not an organization composed of autonomous units; it was a centralized organization. The various divisions, regions and branches were but extensions of the home office.

Ms. Thompson was a manager in the home office personnel department. Her statement as to the centralized administration of salaries and job functions supports this Court's finding above that the regional offices of Gay & Taylor may be considered as a single establishment if the evidence shows strong central authority. Further, the Court cannot turn its back on Ms. Thompson's statement, based upon her experience within the company, that Ms. Brownlee was treated differently than similarly situated male managers. This presents a question of material fact, and any bias or attack on Ms. Thompson's credibility must await trial.

Therefore, the Court rejects the defendant's contention that Ms. Brownlee was not qualified for her position as a matter of law. There exist issues of material fact as to whether she was treated in the same way as male managers who also failed to meet the company's performance goals.

As to the plaintiff's state tort claim, the Court declines to exercise pendent jurisdiction consistent with the reasoning set forth by Judge Theis in *Wilkins v. Baldwin Piano and Organ Co.*, 28 FEP Cases 154 (D.Kan.1980).

ACCORDINGLY, IT IS ORDERED this 28 day of June, 1985, that defendant's motion for summary judgment should be and is hereby overruled. Counsel for the parties are ordered to appear in chambers on July 29, 1985, at 11:30 A.M., for a status conference to set the case for a settlement conference and trial date.

## SUPPLEMENTAL MEMORANDUM AND ORDER

This is a sex discrimination in employment suit. Plaintiff claims she was denied equal pay for equal work in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), and that she was discriminated against with respect to her compensation and was wrongfully demoted in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) & (2).

In a summary way, it appears the plaintiff began work as a bookkeeper for Kansas Claims Service in 1971. Defendant Gay & Taylor, Inc., an insurance adjusting firm, purchased Kansas Claims Service effective August 1, 1973. Plaintiff continued employment with Gay & Taylor. Plaintiff was promoted to Assistant Manager in 1975, was promoted to Supervising Branch Manager III on March 21, 1977, and was promoted to Supervising Branch Manager IV on October 1, 1977. In mid-1978, Gay & Taylor reorganized the management structure of the company, and plaintiff was reclassified from the title of Supervising Branch Manager IV to the title of Branch Manager II. At the end of 1979, Gay & Taylor again reorganized their management structure, reinstituted middle-level management, and used the title District Manager for managers who managed more than one office. Plaintiff's title was changed from Branch Manager II to Dis-

trict Manager III. Plaintiff received salary increases throughout this time period. Gay & Taylor had a written Salary Administration Program which set forth the job descriptions and salary ranges for the various positions within the company. Plaintiff's salary was always adjusted to be within the proper salary range whenever she received a promotion or reclassification, although her salary was generally at the lower end of the salary range.

In 1980 and 1981, all managers under John Robertson, the Regional Vice President supervising plaintiff and others, were given a profit goal of .900 mils, which means a profit of 10 cents on the dollar, or $1.00 in revenue for each $0.90 of expense. Plaintiff failed to meet this profit goal in 1980 and early 1981. Mr. Robertson, on January 9, 1981, wrote plaintiff a memo advising her that he would not accept the type of performance that her district showed during 1980, that he would measure her performance in mid-March against the goals he set out in the memo, and that he would make recommendations at that time. In June 1981, plaintiff had failed to meet the profit goals set forth in the memo, and she was demoted from District Manager III to Adjuster III with a concurrent salary reduction. Plaintiff resigned from Gay & Taylor on July 15, 1981.

This case came on for trial before the Court on November 5, 1985, following the filing of the Court's comprehensive Memorandum and Order of June 8, 1985 (Dkt. # 46). That order is mentioned because those findings are of interest here. Pursuant to that decision, the issues for resolution were appropriately shaped. The Court has defined the "establishment" necessary for comparison as that of the regional offices of Gay & Taylor under the supervision of Mr. John Robertson. Next, the defendant has contended that its salary program is exempt under Title VII and the Equal Pay Act; plaintiff has urged that the salary program was inconsistently and discriminatorily applied to her throughout her employment. Indeed, there was considerable pretrial controversy with regard to plaintiff's failure to meet the defendant's

profit goals of .900 mils in 1980 and early 1981, and the ramifications thereof, principally as compared with the performance of certain male adjusters, have been taken up here as a matter of controversy. The conflicting and seemingly inexplicable affidavits, which were considered at the time defendant's motion for summary judgment was taken up, mandated clarification by full trial of the referred issues.

The Court has now heard the witnesses, examined considerable exhibits, and reviewed pertinent portions of the transcript, trial notes and comprehensive briefs. The proposed findings of fact and conclusions of law submitted by defendant are generally adopted as follows:

### Findings of Fact

1. Plaintiff Patricia Ray Brownlee is a female resident of the State of Kansas. Plaintiff was the only female District Manager of Gay & Taylor, Inc. from 1977 through 1981.

2. Defendant Gay & Taylor, Inc. is a corporation with branch offices in Kansas. Gay & Taylor is an insurance adjusting company. The home office is at Winston-Salem, North Carolina, and there are approximately 150 branch offices in 25 states. (Pl. Ex. 9.)

3. Defendant Gay & Taylor, at all relevant times while plaintiff was a District Manager from 1977 through June 1981, used a detailed Salary Administration Program to set the salaries of all employees nationwide. The entire salary program was periodically revised to keep pace with inflation. The program provided detailed instructions and percentage guidelines for salary administration, merit increases, and promotions. (Def. Ex. A.) In the Court's view, and for the purpose of this decision, this program does indeed provide fair and equitable compensation geared to an employee's job, performance in that job, and overall contribution to defendant's company.

4. Within the salary scale, the determination of a minimum salary level for dis-

trict managers was based upon quantity of production—the total revenue produced by the district. Each level had a low, middle, and high range of salary amounts. At each level, the difference in salary between the low and high ranges varied from approximately $400.00 to $800.00. (Def. Ex. A, C–1 & C–2.) Within each level, the program provided for salary adjustments based upon the most recent compensation of the individual, district profitability, meritorious performance, length of experience, and various other factors. None of these factors was based upon sex. Nor is a person's sex shown to be considered at any time, by anyone, in the administration of this program. The program did not provide for comparisons between predecessors, successors or other managers.

5. The most important factor in salary review was district performance. Profitability was measured by the "mil" factor, a quotient obtained by dividing the dollars of operating cost by the dollars of revenue per month. (A mil factor of .900 represented 10% profit, ten cents profit per dollar of revenue. The higher the mil factor, the lower the profitability. A mil factor over 1.0 represented a loss.) In addition to current mil factor, the reviewer would also consider whether the district showed improvement or decline based upon annual mil factors, files opened, files billed, per file billing average, and various other monthly and yearly statistical comparisons. (Def. Ex. H & P.)

6. Salary changes were initiated by managers in the field and clerically reviewed in the Department of Human Resources at the home office. (Def. Ex. A.) The Department of Human Resources had no authority to recommend or change a salary. Only changes which deviated from the salary program in some way (such as error in classification or salary computation) were sent to Home Office operations upper management for additional review.

7. In 1977 through 1981, plaintiff's salary was within the proper salary scale level, with minor exceptions due to program revisions affecting males as well. (Def. Ex. A, C–1, C–2, & I.)

8. In 1971, plaintiff Patricia Ray (later Brownlee) was employed by Kansas Claims Service as a bookkeeper. Gay & Taylor purchased Kansas Claims Service on August 1, 1973. Gay & Taylor's bookkeeping was centralized at the home office, but the company retained plaintiff as a Secretary II at a salary of $460.00 per month. Plaintiff received 13 consecutive raises and five consecutive promotions in the next seven years. (Pl. Ex. 1 & 31.)

9. Plaintiff was promoted on February 1, 1975, to Claims Specialist I. (Pl. Ex. 1.) Claims Specialist was a job category created by Gay & Taylor to assist interested female clerical employees to move into claims adjusting. (Def. Ex. A.)

10. On October 1, 1975, plaintiff was promoted to Assistant Manager of the Wichita office by the Manager, Dwayne Brownlee. (Pl. Ex. 1.)

11. In late 1976, Dwayne Brownlee was promoted to Divisional Vice President. He continued to be based in the Wichita office, but his promotion created an opening for a new manager in Wichita. There were several short-term managers.

12. In early 1977, the current manager of the Wichita office, Norbert Ziegler, was transferred to Oklahoma City. (Def. Ex. E.)

13. On March 21, 1977, plaintiff was promoted by Dwayne Brownlee to Supervising Branch Manager III (SBM III) of the Wichita district with a raise in salary from $1,000.00 to $1,200.00 per month, the minimum scale for SBM III. (Pl. Ex. 1; Def. Ex. A.) As Supervising Branch Manager of the Wichita district, plaintiff managed offices in Wichita, Hutchinson, and Salina, Kansas, and Ponca City, Oklahoma. At the time of her promotion, plaintiff had been doing some claims adjusting for two years, with part of her time spent on clerical and assistant manager duties. (Pl. Ex. 1.) Promotion to SBM with as little adjusting and management experience as plaintiff had was unusual. (Def. Ex. C–1, C–2 & C–3.)

14. Effective October 1, 1977, plaintiff was reclassified from SBM III to SBM IV, with a raise of $226.00 per month, to $1,426.00 per month, because of increased revenue in the Wichita district. The reclassification request was dated September 6, 1977, and plaintiff's salary was within the current (Dec. 1976) Salary Administration Program scale which had a range of $1,300.00 to $2,000.00 for SBM IV. (Pl. Ex. 1; Def. Ex. A.)

15. After the salary scale program was adjusted in October 1977, plaintiff received another raise to $1,521.00 effective January 1, 1978, to adjust her to the new SBM IV salary scale. (Pl. Ex. 1.)

16. In May 1978, plaintiff married Dwayne Brownlee, who continued to be based in the Wichita office as Divisional Vice President. (Pl. Ex. 1.)

17. In mid-1978, Gay & Taylor eliminated the middle management level of Supervising Branch Manager. Most Supervising Branch Managers, renamed Branch Managers, went from managing several offices to one office. Plaintiff continued to manage the Wichita and Hutchinson offices together. She no longer managed the Salina and Ponca City offices. (Pl. Ex. 1.)

18. Although plaintiff's responsibilities were reduced by the management change, her salary was increased at that time to mid-range, from $1,521.00 to $1,635.00. The salary scale was: minimum $1,326.00 to $1,503.00; control point (mid-range) $1,504.00 to $1,680.00; and maximum $1,681.00 to $1,856.00. (Pl. Ex. 1.)

19. At year end 1979, Gay & Taylor reinstituted a middle level of management, like the SBM concept, but using the title District Manager (DM). Plaintiff's title changed from Branch Manager II to District Manager III (DM III). A new salary scale was instituted in which the minimum range for DM III was $1,601.00 to $1,814.00, the control point (mid-range) was $1,815.00 to $2,028.00, and the maximum range was $2,029.00 to $2,241.00. Plaintiff's salary was within scale at $1,635.00. (Pl. Ex. 1.)

20. In January 1980, plaintiff's salary was reviewed by her new supervisor, Regional Vice President John Robertson. (Dwayne Brownlee had become ill with cancer and died in 1979.) Plaintiff was given a raise from $1,635.00 to $1,774.00, or $139.00 per month, effective February 1, 1980. Robertson's comment on plaintiff's salary classification change recommendation is, "The Wichita Office ran .900 for 1979, and claims volumes increased 42% over 1978. Wichita profit center also ran .900 mils, this is annual raise, employee is worthy of the raise." (Pl. Ex. 1.)

21. The goal of all managers under Robertson in 1980 and 1981 was to operate at .900 miles or less. However, during 1980 the claims volume went down significantly in plaintiff's district. Also during 1980 the costs in plaintiff's district went up. Plaintiff's district mil factor for year end 1980 was .978, the worst in the midwest region under Robertson. (Def. Ex. H.)

22. Plaintiff was placed on probation and therefore did not receive a raise upon annual review in January 1981. (Pl. Ex. 1.) The then current salary program policy on increases (Ex. C, p. 50) stressed: *No salary increase should be granted for less than satisfactory performance.* (Def. Ex. A.)

23. Plaintiff had less adjusting and adjusting management experience when she was promoted to District Manager in 1977 than her predecessor and successor had at the time they were promoted to DM at Wichita.

24. Considerable focus has been given to the comparable circumstances of certain male employees within the Wichita area. Plaintiff's predecessor Norbert Ziegler was paid $1,325.00 per month, more than plaintiff at $1,200.00 as of her promotion. Ziegler, however, had joined Gay & Taylor as an experienced Adjuster II in January 1973. He had at least four years experience as an adjuster plus three years as a manager for Gay & Taylor before becoming Manager at Wichita. Upon promotion to Manager, he was entitled to a raise above his salary as a successful adjuster.

(Def. Ex. A.) Plaintiff had only two years combined adjusting and assistant management experience upon promotion to Manager. (Def. Ex. E; Pl. Ex. 1 & 31.) Plaintiff's salary was lower than Ziegler's because of factors other than sex.

25. Plaintiff's successor, Vernon Allison, received a promotion and raise in June 1981 when he was moved to Wichita from Branch Manager at Fort Dodge, Iowa. Allison had more combined adjusting and adjusting management experience when he became a District Manager than plaintiff had when she first became a District Manager. Allison was paid more than plaintiff. Allison's salary was computed according to the salary program based upon his 1980 compensation as a very successful adjuster and branch manager. (Def. Ex. F.) There was no evidence that the salary computation was improper, incorrect or discriminatory. Plaintiff's salary was lower than Allison's because of factors other than sex.

Clearly, the salaries of Ziegler and Allison were set as directed by the salary scale, without regard to the salary or mil factor of other managers. (Def. Ex. A & F.)

26. The Manager most comparable to plaintiff in experience and career path was Jack Dawkins, also a District Manager in the midwest region in 1980. Dawkins had two years more adjusting experience, but plaintiff became an Assistant Manager over a year earlier. Both held the title of Assistant Manager in 1977, Supervising Branch Manager IV in 1978, Branch Manager II in 1979, and District Manager in 1980. As Assistant Manager, Supervising Branch Manager IV, and District Manager, their salaries were within a few dollars of each other. Most of the time plaintiff was paid more, and she was paid more in 1980 as District Manager III than Dawkins was as District Manager IV. (Def. Ex. W.)

27. John Robertson, Regional Vice President, placed plaintiff on 3-month probation in early January 1981, after her district performed poorly in 1980. Plaintiff's district had the worst mil factor (.978) in the midwest region in 1980. Plaintiff received a probationary letter setting out specific goals to be met. (Pl. Ex. 10.) Most goals were the same as the goals for other midwestern managers, and plaintiff generally failed to meet those goals.

28. In 1980 and 1981, plaintiff had a poor mil factor, decline in files opened and billed, and rising costs as shown in the monthly operations comparisons. (Def. Ex. H & P.) Plaintiff blamed her poor performance in 1980 on a lack of hailstorms in her district. There was some hail in her district in 1980. (Ex. R.) The company expected all of its managers to make a profit regardless of weather factors.

29. Additionally, profit and loss analysis letters between Robertson and all midwest region managers, including plaintiff, are compared and show that Robertson treated all managers the same in keeping them apprised on a monthly basis of his criticisms and analyses of their district performances. (Pl. Ex. 5, 13, 14, 16, 17, 18, 19 & 20; Def. Ex. D, L & Q.) Managers were also aware of their performances as reported by the mil factor and audit of their offices by Robertson.

30. The second lowest ranking midwest manager in 1980, Jerry Jacober, had a mil factor of .946. Robertson planned to demote him, but he resigned in January 1981, a few weeks after plaintiff was placed on probation. (Def. Ex. C–2.) Plaintiff made only 2.2 cents profit per dollar of revenue at .978, while Jacober made over twice as much, 5.4 cents. On a profit margin of 10 cents per dollar of revenue, the difference between two and five cents is not insignificant. The next lowest male manager in Robertson's region, Richard Teasdale of Des Moines, Iowa, had a mil factor of .911, very near the mil goal of .900. The other two male district managers in Robertson's region did well, with year end 1980 mil factors of .907 (Dwain Ogden, Poplar Bluff, Missouri), and .878 (Jack Dawkins, Kansas City). (Def. Ex. H.) When plaintiff was placed on probation, Robertson had only the Wichita, Columbia, Des Moines, Poplar Bluff, and Kansas City offices in his re-

gion. He had no authority in other regions to set salaries, hire, demote, or terminate.

The Court notes here that the findings reflected in defendant's Exhibit W are most helpful in attempting to compare plaintiff's treatment as regards her counterpart within the midwest region. Plaintiff has seized upon modest discrepancies. A review of witness Robertson's testimony, as he describes this exhibit and addresses each employee's circumstance, has clarified any discrepancies.

31. Plaintiff remained on probation for five months. Her district performance continued to be poor. (Def. Ex. B & P.)

32. Plaintiff was demoted to adjuster in June 1981. Her salary was reduced. (Pl. Ex. 1.) Male managers who performed poorly were also demoted and received salary reductions. (Def. Ex. J.)

33. Plaintiff's probation was originally set for three months but she was allowed five months to improve her district. She lost money in four out of the five months she was on probation, and she lost money in 10 of the last 15 months she was District Manager. (Def. Ex. B.) Plaintiff's probation and demotion were the result of poor performance, measured by objective factors. There was no evidence plaintiff's probation and demotion were the result of sex discrimination.

34. Plaintiff resigned from Gay & Taylor in July 1981, and two days later opened an office as Manager for Mid-States Adjustment in competition with defendant.

35. Penny Thompson, a Personnel Manager at Gay & Taylor from July 1977 to April 1979, worked with the salary program and affirmative action plans. An affirmative action plan and salary program were in place prior to her hiring. District offices were required to report on adjuster applicant flow. Most women became adjusters at Gay & Taylor by moving from clerical jobs to claims specialists, but women adjusters were also hired from outside the company, as was plaintiff witness Diann Spaniel. Ten to 12 percent of defendant's adjusters were women, which

was the same as the applicant flow for female adjusters. Ms. Thompson did some studies showing that women adjusters were paid less than men as a group; however, women had less adjusting experience as a group. In the Gay & Taylor home office, three out of 10 managers, including Ms. Thompson, were women. (Pl. Ex. A; Def. Ex. I, C–1 & C–2.)

36. In the years of plaintiff's claims, while plaintiff was a District Manager and Supervising Branch Manager from 1977 to 1981, 54 out of 55 male managers each had a range of two to 37 years more combined adjusting and management experience (or seniority) than plaintiff. Seven of the 55 managers were always paid less than plaintiff even though they had more combined adjusting and adjusting management experience. (Def. Ex. C–1, C–2 & C–3.)

It is clear, on hearing this kind of evidence, that both sides have attempted to exceed the boundaries of the establishment defined by this Court in the interest of persuading their respective positions. While this evidence changes nothing, it is helpful as the Court garners some perception of the operation of defendant's company.

37. Myron Hull, who had many years of experience as an adjuster and had also been a manager, worked in the same office with plaintiff throughout her adjusting career. He rated plaintiff "below average" as a manager. He and Mary Lou Blodgett, a secretary under plaintiff, both testified plaintiff had poor work habits and spent much time on personal telephone calls, newspaper reading, and shopping. Plaintiff's witnesses, Diann Spaniel and Margaret Blecka, did not work for plaintiff in 1980 and early 1981 when her district performed poorly. Ms. Blecka worked for plaintiff in 1976 and 1977, and Ms. Spaniel worked with plaintiff for a few months at the end of her probation and after her demotion. Thus, neither was in a position to observe plaintiff during the period at issue.

*Conclusions of Law*

1. This Court has jurisdiction over the parties and the subject matter of this case pursuant to 42 U.S.C. § 2000e–5(f)(3), and 28 U.S.C. § 1343. The Court concludes plaintiff has met the jurisdictional prerequisites for bringing this suit. (Pl's Complaint; Court's Memorandum and Order, June 8, 1985.)

2. Gay & Taylor is an "employer" as defined in 42 U.S.C. § 2000e(b) and is subject to the provisions of Title VII.

3. Gay & Taylor is subject to the provisions of the Equal Pay Act.

4. Plaintiff claims discrimination in pay on the basis of sex under both Title VII and the Equal Pay Act. Gender-based discrimination in pay is actionable under both the Equal Pay Act and Title VII, and it is consistently held that the two statutes are *in pari materia* and must be construed in harmony with one another. *E.g., Gunther v. County of Washington*, 623 F.2d 1303, 1309 (9th Cir.1979), *aff'd* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); *Miller v. Kansas Power & Light Co.*, 585 F.Supp. 1509, 1511 (D.Kan.1984); *DiSalvo v. Chamber of Commerce, Etc.*, 568 F.2d 593, 596 (8th Cir.1978); *Ammons v. Zia Company*, 448 F.2d 117, 119 (10th Cir. 1971); *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 266 (3d Cir.1970), *cert. denied* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).

5. The four affirmative defenses of the Equal Pay Act apply to Title VII pay cases. *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). The Equal Pay Act exempts payment made pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: ..." 29 U.S.C. § 206(d)(1).

6. Under both Title VII and the Equal Pay Act, a female plaintiff has the initial burden of proving that the employer paid higher wages to males for work that was substantially equal in terms of skill, effort and responsibility. The burden of proof then shifts to the employer to establish that the difference in wages resulted from the existence of an affirmative defense under the Equal Pay Act or some additional factor other than sex. *Miller v. Kansas Power & Light Co., supra* at 1512.

7. Plaintiff met her burden of establishing a prima facie case of discrimination in pay under Title VII and the Equal Pay Act. Plaintiff showed that she was a female, that she was paid less than some males who were also district managers at her level, and that the job of district manager at her level required similar skill, effort and responsibility. *Miller v. Kansas Power & Light Co., supra.* As the U.S. Supreme Court stated in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." In any group of males and females doing the same job, the female will always be able to establish a prima facie case if any male in her job category is paid more.

8. The defendant employer, Gay & Taylor, met its burden of proof under Title VII and the Equal Pay Act by showing that the salaries of all district managers, including plaintiff, were set at all times on the basis of a comprehensive Salary Administration Program, which was based on factors other than sex. *Equal Employment Opportunity Comm. v. Aetna Insurance Co.*, 616 F.2d 719 (4th Cir.1980).

9. Within the midwest region, the male manager most comparable to plaintiff in experience and career progress was Jack Dawkins. Plaintiff was usually paid more than Dawkins. (Def. Ex. W.) Males paid more than plaintiff in the midwest region had more experience. (Def. Ex. C–1, C–2 & C–3.) While probably irrelevant here, nationally males paid more than plaintiff had more adjusting and adjustment management experience. Over half of the male managers had 10 years or more seniority when plaintiff first entered management.

**362**

(Def. Ex. C–1, C–2 & C–3.) The Equal Pay Act contemplates that male employees with more experience may receive higher salaries than less experienced women. *Corning Glass Works v. Brennan,* 417 U.S. 188, 204, 94 S.Ct.. 2223, 2232, 41 L.Ed.2d 1 (1974). Even if the entire company was viewed as the "establishment", we would not reach a different result. Gay & Taylor did not discriminate when it paid more experienced managers more than plaintiff was paid. *Wheeler v. Armco Steel Corp.,* 471 F.Supp. 1050, 1053 (S.D.Tex.1979).

10. Plaintiff's salary was within the guidelines of the salary program except for short periods when the program was revised for inflation and plaintiff's salary required adjustment to the new minimum for her level. Male managers' salaries also required adjustment to new minimums. (Def. Ex. I, C–1 & C–2.) We find that any deviation of plaintiff's salary from the salary program was a result of program revisions and not the result of sex discrimination. *E.E.O.C. v. Aetna Insurance Co.,* 616 F.2d 719 (4th Cir.1980).

11. Defendant's salary program had all elements included in the Equal Pay Act and Title VII exemptions. The program set salary levels for district managers based upon *quantity of production* (the revenue of a district). Within each level there was a *merit* system and a *seniority* system, because raises were awarded for meritorious performance and based upon previous compensation (which was related to length of experience). The salary system clearly was based on *factors other than sex,* and was not shown to operate in a discriminatory manner, thus falling within the fourth exemption, if not all exemptions, to the Equal Pay Act.

12. Plaintiff failed to produce any evidence of pretext to rebut Gay & Taylor's evidence of the operation of its salary program. Salary level and review were primarily based upon objective statistics, unrelated to sex. Gay & Taylor did not unlawfully discriminate against plaintiff on the basis of sex under Title VII or the Equal Pay Act regarding her compensation when she was a District Manager. *Miller v. Kansas Power & Light Co., supra; E.E. O.C. v. Aetna Insurance Co., supra.*

13. Plaintiff claimed that her probation and demotion in 1981 were discriminatory. Plaintiff's district had the poorest record in Robertson's region in 1980, with a mil factor of .978 versus a mil goal of .900.

14. Defendant has taken the position that because of plaintiff's poor performance in 1980 she was no longer "qualified" as manager and could not make out a prima facie case. *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Huhn v. Koehring Co.,* 718 F.2d 239 (7th Cir.1983); *Kephart v. Institute of Gas Technology,* 630 F.2d 1217 (7th Cir.1980); *Loeb v. Textron, Inc.,* 600 F.2d 1003 (1st Cir.1979); and *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277 (7th Cir.1977). Arguably, the Court will assume that since some male managers did not meet the mil goal and were not put on probation, plaintiff met her burden and demonstrated a prima facie case by showing that she was a female, that she was qualified for her job, and that she was demoted. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

15. Plaintiff claimed that her probationary letter was discriminatory; that Robertson discriminated when he placed her on probation but not the male managers who missed the .900 mil goal. Of the four male managers in Robertson's region, one surpassed the .900 mil goal, two were near goal, and the fourth made five cents per dollar of revenue compared to plaintiff's two cents per dollar. Plaintiff's performance was clearly the worst, and it was not discriminatory to put her on probation. Plaintiff cited no authority to the Court that a probationary letter for poor performance is in itself discriminatory. The written probationary mil goal of .900 was the same goal set for all managers in 1980 and 1981. Goals for cost recovery and meeting budget were also the same for all managers. Robertson required plaintiff to report on her sales efforts and perform audits

during probation more often than other managers. These requirements were to aid plaintiff in improving her sales program, to keep track of plaintiff's efforts during probation, and to insure that an audit (usually semi-annual) was performed on each of her offices during the probationary period. The probationary letter also required personal production by plaintiff of $2,000.00 per month. Male managers were not given such a written goal because their personal production generally already exceeded $2,000.00 per month. The Court finds that the requirements of plaintiff's probation were reasonable and not the result of sex discrimination. *Burrus v. United Telephone Co. of Kansas, Inc.*, 683 F.2d 339, 344 (10th Cir.1982).

16. Defendant Gay & Taylor met plaintiff's prima facie case by articulating legitimate nondiscriminatory reasons for plaintiff's probation and demotion. Objective indicators of plaintiff's poor performance were provided by operations comparisons for 1980 and 1981. (Def. Ex. H & P.) Plaintiff lost money in 10 out of 15 of her final months as a manager, including four out of five months when she was on probation. The employer's evidence was not rebutted by any showing of pretext. There was no evidence that plaintiff was put on probation or demoted for any reason except poor performance. *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at 251, 101 S.Ct. at 1092; *Burrus v. United Telephone Co. of Kansas, Inc., supra,* at 342.

17. The testimony of plaintiff's witnesses, Penny Thompson, Jerry Jacober, Richard Teasdale, Diann Spaniel, and Margaret Blecka, did not demonstrate pretext and is in concurrence with these findings of fact and conclusions of law. *Id.* The Gay & Taylor salary plan was fair in form and did not result in discrimination in practice. The operations comparisons, including the mil factor, which were the basis of plaintiff's probation and demotion, were objective indicators of defendant's business. There was no proof that they operated to cause any disparate treatment or had an adverse impact on plaintiff because she was a female. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). There was no evidence that plaintiff was discriminated against in the terms and conditions of her employment, either under Title VII or under the Equal Pay Act. There was no evidence plaintiff Brownlee was discriminated against in any manner by defendant Gay & Taylor.

IT IS THEREFORE ORDERED this 3 day of February, 1986, that judgment be entered in favor of defendant Gay & Taylor, Inc., and against plaintiff Patricia Ray Brownlee on all of her claims for relief.