**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Appellant,**

v.

**AETNA INSURANCE COMPANY,
Appellee.**

**No. 79–1086.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 5, 1979.
Decided Feb. 27, 1980.

Colleen M. O'Connor, E. E. O. C. (Marshall H. Harris, Regional Sol., Philadelphia, Pa., Carin Ann Clauss, Sol. of Labor, Donald S. Shire, Associate Sol., Lois G. Williams, Mary Ann Bernard, U. S. Dept. of Labor, Washington, D. C., on brief), for appellant.

James Patrick McElligott, Jr., Richmond, Va. (W. Carter Younger, McGuire, Woods & Battle, Richmond, Va., on brief), for appellee.

Before FIELD, MURNAGHAN and SPROUSE, Circuit Judges.

MURNAGHAN, Circuit Judge:

The Secretary of Labor,[1] on behalf of Nellie Barratt, an insurance underwriter for Aetna Insurance Company ("Aetna"), brought an action under section 17 of the Fair Labor Standards Act, 29 U.S.C. § 217, to enjoin Aetna from violating the Equal Pay Act, 29 U.S.C.A. § 206(d), and to recover from Aetna unpaid wages due under the Act. The Secretary alleged that Aetna was discriminating against Barratt on the basis of sex because a male employee, who performed the same job as she, was paid more. The District Court (Warriner, J.) found that Barratt and the male employee performed substantially the same job but that any disparity in pay between Barratt and the male employee was attributable to a bona fide merit system. Such a merit system is one of the four specified exemp-

---

1. On appeal, this case was argued by the Equal Employment Opportunity Commission which, pursuant to Reorganization Plan No. 1 of 1978, Section 1, now has the responsibility to enforce the Equal Pay Act.

tions under the Equal Pay Act. While we agree that the hiring of the male employee at a higher salary was pursuant to one of the four exemptions, we affirm, not on the basis of the merit system exemption, but rather because of the exemption permitting differences in pay if based upon factors other than sex.

*Factual Background*

In early 1970, Aetna's regional office in Richmond, Virginia hired Nellie Barratt as a Grade 11[2] commercial casualty underwriter at an annual salary of $7,000. When joining Aetna, Barratt had six years of experience in the insurance industry, most of which was in the underwriting area. For that experience, Aetna gave her credit for 2 years, 6 months experience.

Three years later, on March 19, 1973, Aetna hired James W. Garrett as a Grade 12B commercial underwriter. His salary was $11,000; because he had over 15 years of underwriting experience, Aetna gave him credit for 4 years of prior experience. When he was hired, Barratt was earning $8,800. However, a month after Garrett was hired, Barratt was promoted to Grade 12 and her salary was raised to $9,500. Although Barratt and Garrett performed the identical job, Garrett received $1,500 more in compensation. During the next three years, Barratt and Garrett worked side by side until January 1976 when Aetna terminated Garrett for poor job performance. At the time of his dismissal Garrett's salary was $13,200; Barratt's salary was $11,900. During the 3-year period Garrett's salary was consistently higher than Barratt's.

Barratt, after discovering that her co-worker had been compensated at a higher rate than she, complained to her supervisor and to the Department of Labor. The latter undertook an investigation. Probably due to the impetus of the government's investigation, Aetna voluntarily gave Barratt a retroactive pay increase so that her salary receipts belatedly matched those of Garrett for the period that they worked together. As a consequence, any possible claim that Barratt might have against Aetna for wage discrimination, as between her and Garrett, was rendered moot.

To fill the void left by Garrett's departure, Aetna, on February 2, 1976, hired Christopher Archer. Archer, who had 8 years of underwriting experience, was hired as a Grade 12E underwriter at a salary of $14,700. As a commercial casualty underwriter, Archer had the same job, performed the same duties, and assumed the same responsibilities as Barratt and Garrett. Notwithstanding, Archer was compensated at a rate of $14,700 a year while Barratt was receiving $11,900. On April 5, 1976, her salary was raised to $13,000 and on September 9, 1976 her salary was raised to $13,200. Despite the increases, Barratt was still paid less than Archer.

After being with Aetna for less than one year, Archer was promoted to the position of training coordinator at a salary of $16,300 a year. Soon thereafter, on April 4, 1977, Barratt's salary was raised to $14,200, a figure still not as high as Archer's starting salary. A year later, she was promoted to Senior Casualty Underwriter, Grade 13, with a salary of $16,700.

The Secretary contended that the salary differential existing between Barratt and Archer during the one year they performed the same job was based upon sex discrimination in violation of the Equal Pay Act. Following a lengthy trial, the lower court, after a careful examination and comparison of the duties and responsibilities of both Barratt and Archer, held that the Secretary had established a *prima facie* case of sex discrimination by showing that "the work performed by female Barratt was substantially equal to that performed by male Archer, that their respective duties required substantially equal skill, effort and responsibility, that they worked under similar working conditions, and that male Archer was paid a higher salary than female Barratt."

The court then turned to whether Aetna was able to rebut the Secretary's *prima*

---

2. At Aetna, each job has a salary range; each salary range has a grade number.

*facie* showing by proving that the pay differential was justified by one of the four statutory exemptions. It concluded that Aetna had proven that the differential came within the merit system exemption of the Act. 29 U.S.C. § 206(d)(1)(ii). More specifically, the court found that Aetna had two distinct and separate merit systems: one for incoming employees; and another for persons already employed at the company. With respect to the former, the company assessed the "merit" of the prospective employee by "evaluating his job application information and his responses to a number of interviews by supervisory personnel," while the other merit system was in writing and made periodic salary adjustments for employees who had accumulated service with the company according to past performance and the company's goals and objectives. In Archer's case, the hiring decision was based upon the interviews and application information. The court acknowledged that, by its nature, the criteria was subjective and could "be subject to conscious or unconscious sex bias" but then proceeded to state that Archer's salary was set by a system different from that which set Barratt's salary. We read that as a finding that sex bias was not the cause of the pay differential, the explanation being rather that Archer was measured by one sex-blind standard applicable to new hires, while Barratt was measured by another sex-blind standard applicable to existing employees.

In addition, the court was convinced that "the difference between Mrs. Barratt's salary and Mr. Archer's starting salary was not determined on the basis of sex but was based upon Aetna's reasonable expectation that Mr. Archer's ability and more substantial prior underwriting and managerial experience would allow him to take on greater responsibility and would make him a more valuable employee." Noting that decisions like those here involved are by necessity matters of judgment, the court declined to substitute its judgment for Aetna's in view of the conclusion that the company's decision was not based upon an impermissible consideration. Furthermore, the court

mentioned that, while subjective decisions may invite discrimination, especially when routine work is involved, they are necessary nonetheless when jobs such as casualty underwriter, which involve complex decision-making, are concerned.

*Were the Trial Court's Findings Clearly Erroneous?*

There is only one issue that appellant presents for our review: did the lower court err in concluding that the pay differential between Barratt and Archer was not attributable to discrimination but rather to a merit system within the meaning of the Equal Pay Act. Our review is governed by the clearly erroneous rule, F.R.Civ.P. 52(a): a lower court's findings must be upheld provided that "substantial evidence" exists to support their determination. *Hodgson v. First National Bank,* 446 F.2d 47, 48 (5th Cir. 1971). *See also Gunther v. County of Washington,* 602 F.2d 882, 887 (9th Cir. 1979); *Keyes v. Lenoir Rhyne College,* 552 F.2d 579, 580 (4th Cir. 1977), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977); *Hodgson v. Golden Isles Convalescent Homes, Inc.,* 468 F.2d 1256, 1257 (5th Cir. 1972). Of critical importance to us, therefore, is the substance of the testimony relating to Aetna's compensation standards as well as the justifications offered by the company for its decision to compensate Archer at a rate which turned out to be higher than the rate for Barratt.

At the trial, three Aetna managerial representatives, involved in the hiring of Archer, testified: John Evans Rees, commercial underwriter supervisor; Michael Katos, agency development manager; and Jean McFarland, underwriting manager. They testified that, following the termination of Garrett, the company embarked on an active search to locate a new underwriter, one with commercial casualty experience. Such experience was critical to Aetna at that time in its development because the commercial casualty area was one in which Aetna perceived itself deficient. It believed that an underwriter with a strong background in the area would, in all probability, strengthen its position in the marketplace.

To find a new underwriter, Aetna, in addition to launching an independent search of its own, sought the services of an employment agency. Soon thereafter, the employment agency referred Christopher Archer to Aetna. Rees, Katos, and McFarland each interviewed Archer. They were impressed with his demonstrated ability, his apparent potential to assume supervisory, and later, managerial responsibilities, his flexibility, his poise, his analytic ability, and his pleasant and accommodating personality. All three interviewers rated Archer above average in technical and managerial potential and recommended that he be hired. Archer told them that his salary requirement was $14,700; at the time his salary with his current employer was $13,380.

Aetna decided to hire Archer as a Grade 12E underwriter with an annual salary of $14,700. Katos testified that there were five principal factors contributing to the decision to compensate Archer at a rate of $14,700: first, for 5½ years, he had worked for United States Fidelity and Guaranty Company ("USF&G"), a renowned casualty insurance company; he had a strong background in insurance; his salary at USF&G was $13,380 and he was due for an increase; Archer had been a supervisor at USF&G and he exhibited supervisory and managerial potential; and his salary record indicated an upward trend. According to the memorandum which set forth Aetna's salary policy in 1976 for hiring new employees, it would hire "new employees at the minimum if inexperienced, while considering proper placement within the applicable range for prospective employees." The $14,700 salary given to Archer, who had 8 years of experience, was *below* the middle of the pay range for a Grade 12.[3]

With respect to the compensation paid to Nellie Barratt, the testimony elicited and the evidence submitted at trial revealed that Aetna had a different compensation system for all existing employees. As previously mentioned, the salaries for new employees were governed by the annual company policy statement, the regularly updated salary scale, and the individual's attributes. The salary scale was revised periodically to remain competitive with other insurance companies. Salaries of existing employees, however, were governed by a different system. They were determined by the employee's starting salary plus any merit and inflationary increases plus any adjustments made which were designed to assure that an employee's salary was at least at the minimum for his or her grade level. It appears that the salaries of new employees with experience were not coordinated with the salaries of established employees with comparable experience. Nothing in the record indicates that, in this respect, female employees were treated in any way different from the treatment accorded male employees. Because of the rapid inflationary spiral, and the corresponding monetary increase in starting salaries, it was not uncommon for a new employee to be compensated more than an older employee, although the older employee was performing the identical job. The situation appeared to be attributable to Aetna's failure to monitor the salaries of its older employees and to readjust them to current salary levels. Moreover, even when salaries were adjusted, they, because of monetary limits in the readjustment pool, might have been reset only at the minimum rate for the grade. As a consequence, the experience of the older employee may not have been reflected in the adjustment. Apparently, this is what happened to Barratt, who started working at Aetna in 1970. She views the disparity in compensation as discrimination; Aetna, on the other hand, attributes the differential to a dual merit system and the superior qualifications of Archer.

---

**3.** When Archer was hired, the salary range for a Grade 12 was $11,800 to $19,700. There were four general salary guidelines: the minimum salary was $11,800; if someone had experience and performed satisfactorily ("meets standard") the salary was $15,700; if an underwriter exceeded the normal standard the rate of compensation was $17,700; and when an employee exceeded the standards in an outstanding manner, he could be paid $19,700 annually.

■ Fully mindful of Congress' intent that the exemptions in the Equal Pay Act be narrowly construed,[4] we conclude that the lower court's findings were not clearly erroneous. The findings compel the conclusion that factors other than sex created the pay differentials between Barratt and Archer.

*The Law*

■ Section 206(d)(1)[5] of the Equal Pay Act provides:

(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) *a merit system* ; (iii) a system which measures earnings by quantity or quality of production; or (iv) *a differential based on any other factor other than sex* : *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee. (Emphasis added.)

4. *Hodgson v. Colonnades, Inc.,* 472 F.2d 42, 47 (5th Cir. 1973).

5. Both the Equal Pay Act and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2, protect workers against sexual discrimination in employment. The EPA, however, is more limited in scope, applying only to claims of unequal pay for equal work based upon sex. Title VII is broader and affords a worker the opportunity to challenge other discriminatory compensation practices. Section 2000e–2(h) specially provides that the four exemptions in the EPA apply to actions brought pursuant to Title VII which claim sexual discrimination in wages or compensation paid or to be paid. *See Gunther*

Once the Secretary satisfies his burden of establishing a *prima facie* case, the burden shifts to the employer to prove, by a preponderance of the evidence, that the pay differential is justified by one of the four statutory exemptions. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 196, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Hodgson v. Fairmont Supply Co.,* 454 F.2d 490, 497 (4th Cir. 1972); *Pedreyra v. Cornell Prescription Pharmacies, Inc.,* 465 F.Supp. 936, 947 (D.Colo.1979); 29 C.F.R. § 800.141 (1979).

The factfindings of the lower court, since they were supported by the evidence and not clearly erroneous, arguably brought into operation two of the exemptions: "(ii) a merit system" and "(iv) a differential based on any other factor other than sex."[6] The legislative history, although not extensive, provides some guidance as to the scope of the exemptions. The Senate Report expressed that body's intent as follows:

S. 1409 is designed to eliminate any wage rate differentials which are based on sex. *Neither the committee nor anyone proposing equal-pay legislation intends that other factors cannot be used to justify a wage differential.* For example, a woman and a man may be doing precisely the same work at adjacent posts, and yet the man may be earning substantially more than the woman, or vice versa, because of his or her tenure on the job. Such seniority systems are valid exceptions provided they are based on tenure and not upon sex.

*v. County of Washington,* 602 F.2d 882, 888–91 (9th Cir. 1979). *See also Spirt v. Teachers Insurance and Annuity Assoc.,* 475 F.Supp. 1298, 1309 (S.D.N.Y.1979); *Pedreyra v. Cornell Prescription Pharmacies,* 465 F.Supp. 936, 944 (D.Colo.1979). *See generally,* Johnson, *The Equal Pay Act of 1963: A Practical Analysis,* 24 Drake L. Rev. 570, 607–10 (1975).

6. *See, e. g., Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (shift differentials may be a subsection (iv) exemption but were not so when the salary differentials were rooted in past sex discrimination).

Similarly, a merit system or piecework system which measures either the quantity or quality of production or performance can result in far greater gross earnings by one person compared to another, even though both are technically doing the same type of work. Obviously, such systems which measure quantity or quality of production or performance will be valid exceptions to the equal-pay requirements. *Without question, employers have other valid classification programs which can justify an exception.* (Emphasis added.)

S. Rep. No. 176, 88th Cong., 1st Sess. 4 (1963). In its report, the House also briefly discussed the exemptions:

Three specific exceptions and one broad general exception are also listed. It is the intent of this committee that any discrimination based upon any of these exceptions shall be exempted from the operation of this statute. As it is impossible to list each and every exception, the broad general exclusion has been also included. *Thus, among other things, shift differentials, restrictions on or differences based on time of day worked, hours of work, lifting or moving heavy objects, differences based on experience, training, or ability would also be excluded.* It also recognizes certain special circumstances, such as "red circle rates." This term is borrowed from War Labor Board parlance and describes certain unusual, higher than normal wage rates which are maintained for many valid reasons. For instance, it is not uncommon for an employer who must reduce help in a skilled job to transfer employees to other less demanding jobs but to continue to pay them a premium rate in order to have them available when they are again needed for their former jobs.[7] (Emphasis added.)

H.R. Rep. No. 309, 88th Cong., 1st Sess. 3, *reprinted in* [1963] U.S. Code Cong. & Admin.News, 687, 689. *See generally*, Johnson, *The Equal Pay Act of 1963: A Practical Analysis*, 24 Drake L. Rev. 570, 591–601 (1975); Sullivan, *The Equal Pay Act of 1963: Making and Breaking a Prima Facie Case*, 31 Ark. L. Rev. 545, 583–606 (1978).

 Congress, therefore, intended that merit systems and experience, training or ability of an employee may justify salary differentials, provided they are not based upon sex.[8] While the definition of experience, training, or ability is self-explanatory, what constitutes a merit system, may not be so obvious. *See generally*, 1 Employment Discrimination, Sex § 31.10 (A. Larson 1975). A merit system, to be recognized as valid, need not be in writing. *See* 29 C.F.R. § 800.144 (1979). *See also* 109 Cong. Rec. 9203, 9208 (1963) (remarks of Reps. Griffin; Waggonner; Griffin and Goodell, respectively). Notwithstanding the absence of a writing requirement, a merit "system" must be an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria. *Brennan v. Victoria Bank and Trust Co.*, 493 F.2d 896, 901 (5th Cir. 1974); *Hodgson v. Brookhaven General Hospital*, 436 F.2d 719, 726 (5th Cir. 1970). Moreover, to be recognized, it would seem that an unwritten merit system must fulfill two additional requirements: the employees must be aware of it; and it must not be based upon sex. *See* 29 C.F.R. §§ 800.142, .144 (1979). *Cf. Shultz v. First Victoria National Bank*, 420 F.2d 648, 654–59 (5th Cir. 1969) (if training program exemption is to be argued, the employees should be aware of the program's existence).

Reading the legislative history provides some indications that references to "a merit system" contemplated an arrangement ap-

---

7. *See also* 109 Cong. Rec. 9196, 9198, 9200, 9203, 9208 (1963) (Remarks of Reps. Thompson; Goodell; Dent; Fountain and Griffin; Waggonner, Griffin, and Goodell, respectively).

8. *See Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1045–47 (5th Cir. 1973), *cert. denied*, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973)

(although the court generally recognized that a company might properly inaugurate or continue a training program with resulting pay differentials, the exemption was inapplicable to the particular program since the program was discriminatory).

**726**

plicable only to existing employees. We are not certain that such was the intention, but it is not necessary to decide whether a compensation system for new employees falls within the statutory exception for a merit system. Even assuming that Aetna's scheme for compensating Archer, as a new employee, was not a "merit system", we are nevertheless satisfied that the pay differential was not based on sex. Instead, the differential was attributable to the existence of two distinct salary programs,[9] neither of which had sex discrimination as a purpose or as an effect. The differential was explained by Archer's experience and background, two considerations which were not sex-linked.[10]

■ The government expresses concern about supposed subjectivity involved in Aetna's decision to hire Archer because of his supervisory and managerial potential. It would have us deem evaluations of capabilities and potential to be too prone to discrimination to qualify as exemptions under the Act. But we are not dealing with the rule of perpetuities and its extreme principle that a theoretical possibility of a breach will lead to a holding that the rule has been violated, regardless of the actual circumstances. If the record were barren of substantial justification or concrete standards for hiring Archer, the argument might be entitled to consideration[11]—but the record amply supports the conclusion of the district court that the decision to hire Archer rested on a more solid foundation than mere subjectivity. Aetna needed an experienced casualty underwriter to fill the void left by Garrett, but, more importantly, it needed an agent to expand its business in the commercial casualty field. Archer had a strong background in the commercial casualty area; he had supervisory experience; and he demonstrated in his interview that he had the personality traits to succeed as an underwriter and later as a supervisor and a manager. An element of subjectivity is essentially inevitable in employment decisions; provided that there are demonstrable reasons for the decision, unrelated to sex, subjectivity is permissible.[12]

Finding no error in the decision below, we affirm.

*AFFIRMED.*

9. Unlike the elusive training programs in *Hodgson v. Fairmont Supply Co.*, 454 F.2d 490, 497–99 (4th Cir. 1972) and *Shultz v. First Victoria National Bank*, 420 F.2d 648, 654–56 (5th Cir. 1969), which were found to be no more than "the process by which one might work his way up in the company," Aetna's salary program for new employees has a more substantial structure. Its foundation is provided by the annual salary program memorandum and salary scale. The value to be assigned any experience, while subjective, is restricted by the limits of the Grade and the suggested requirements for the salary steps within each grade. *See* note 3 *supra.* Reviewing the placement of Archer's salary within this range, we are unable to say that he was overcompensated for his experience.

10. Cf. *Wheeler v. Armco Steel Corp.*, 471 F.Supp. 1050, 1053 (S.D.Tex.1979) ("Although a job classification may have a certain . . . point total, a particular employee, because of his seniority, experience, and education, may be paid more than an employee who has been *newly promoted* into that job classification.") We see no reason why that rationale is not equally relevant in the case of a newly appointed employee who possesses more experience than a more senior employee.

11. See *Pedreyra v. Cornell Prescription Pharmacies*, 465 F.Supp. 936, 947 (D.Colo.1979) (employer who set salaries on the basis of what he felt the employee was worth, without resort to a merit system, production quotas, or other legitimate factors, failed to prove that the pay differential between a female employee and a male employee was based on a factor other than sex).

12. To support its contention that the subjectivity involved in the decision to hire Archer was impermissible, the government relies on *Marshall v. Security Bank and Trust Co.*, 572 F.2d 276 (10th Cir. 1978). In *Marshall*, the employer bank was attempting to justify the pay differential by claiming it maintained a bona fide training program. The lower court held that the bank did not have a training program but that the potential of the male employees justified the pay differential. The Tenth Circuit reversed, holding that, "[s]ubjective evaluations of the employer do not take the place of a bona fide training program and, standing alone, cannot form the basis for salary discrimination based on sex." *Id.* at 279. Here, as already stressed, the hiring decision was dependent on more than purely subjective evaluations.