Anna LISSAK and Betty
Murphy, Plaintiffs,

v.

The UNITED STATES of
America, Defendant.

No. 99–756C.

United States Court of Federal Claims.

April 17, 2001.

Phillip S. Wood, Aurora, Illinois, for plaintiffs.

Kevin McArdle, Commercial Litigation Branch, Civil Division, Department of Justice, and David M. Cohen, Director, and David W. Ogden, Acting Assistant Attorney General, Washington, D.C., for defendant.

## OPINION

BASKIR, Chief Judge.

This case is before the Court on cross-motions for summary judgment. Plaintiffs, two female employees of the Federal Aviation Administration (FAA), allege Defendant violated the Equal Pay Act (the Act) by paying them less than male co-workers who perform the same duties. The Court finds that the pay disparity results from a bona-fide, gender-neutral, acceptable personnel policy. Accordingly, Defendant's motion is granted.

The Court denies Plaintiffs' cross-motion for summary judgment because, among other reasons, Plaintiffs have failed to establish a prima facie case that they perform the same duties as their three male co-workers.

## BACKGROUND

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Each moving party bears the burden of establishing the absence of any disputes of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To understand the cause of the pay disparity cited by the plaintiffs, we must trace the employment history of both the Plaintiffs and their male co-workers. The following facts are not in dispute. We will discuss the "equal work" aspect of the case later in the text.

Plaintiffs originally worked for the FAA Air Traffic Service as air traffic controllers in the Chicago Air Route Traffic Control Center (ARTCC) until September 9, 1981. At that time, they had achieved Full Performance Level Status (FPL) as journeymen, meaning they were certified to operate all of the requisite positions in the Chicago ARTCC. In 1981, the flight controllers' union (PATCO) called an illegal strike. In response, former President Ronald Reagan discharged all striking employees, including Plaintiffs, and prohibited their re-employment.

In 1993, the ban on PATCO strikers was lifted and they were permitted to reapply for employment with the FAA. In June of 1996, the FAA issued a recruitment notice, and Plaintiffs were rehired as FG–9 level Air Traffic Control Specialists with the potential for promotion to FPL status. They were again stationed at the Chicago ARTCC, which had an FPL pay grade of FG–14.

The male employees cited for comparison were also former PATCO strikers, originally banned from re-employment. The government asserts that their increased pay is ultimately attributable to their later date of re-employment, a difference established by collective bargaining agreements between the government and the FAA flight controllers.

### The Agreements

In July of 1998, the air traffic controllers' successor union (NATCA), executed the first of three collective bargaining agreements with the FAA. These three agreements created a new compensation and classification system for air traffic controllers. This case centers around the differences between two

groups of former strikers, the "re-entrant Certified Professional Controller (CPC)" and the "PATCO re-hire." We will address these job categories presently, but first we offer a brief description of the structural changes made to the pay and classification system.

### A. The First Agreement: Pay Bands and Air Traffic Controller Categories

The first agreement created a new pay system, which implemented two major changes. The first replaced pay grade levels with "pay bands," or ranges of pay that define a minimum and maximum salary for each position. The pay bands vary depending upon the Air Traffic Control (ATC) level of the facility at which an individual is employed. The ATC levels are ranked 3 through 12, with a ranking of 12 indicating locations with the heaviest and most complex level of air traffic. The Chicago center has an ATC level of 12. The new pay system set target pay bands for fiscal year 2001 and interim pay bands to take effect at various points during a three-year transition period beginning October 1, 1998.

The second change divided air traffic controllers into two main categories: (1) Certified Professional Controllers (CPCs), individuals who have achieved FPL status at the facilities to which they are currently assigned; and (2) Developmental Controllers (DCs), individuals who have not achieved FPL status at the facilities to which they are currently assigned. For an ATC level 12 facility like Chicago, the new system also divided DCs into three training levels depending upon the number of positions for which the DC was certified. The three male co-workers at issue had achieved current CPC or FPL status at the Chicago ARTCC. It is disputed whether Plaintiffs had achieved that status.

### B. The Second Agreement: Re-entrant CPCs

The NATCA and the FAA executed a second agreement in July, 1998, to implement rules for converting the newly established CPCs and DCs into the pay band system. More important to this case, however, is the fact that the second agreement defined a new job category known as a "re-entrant CPC," and provided the rules for converting the re-entrant CPC into the new pay system. Under the second agreement, a re-entrant CPC is an individual who was hired as an Air Traffic Controller in the Air Traffic Service *after* October 1, 1998, who was previously a PATCO striker, and who had previously achieved FPL/CPC Air Traffic Controller status in the Air Traffic Service terminal or en route option.

On October 13, 1998, the FAA hired the three male air traffic controllers at issue in this case and classified them as re-entrant CPCs. Pursuant to the second agreement, the FAA was required to set the three males' starting salaries at $70,315, which was the minimum allowed in the CPC pay band applicable to ATC level 12 facilities like Chicago. As of the day the plaintiffs filed their complaint, the three males received a basic pay of $73,660. This included their initial salaries, plus the same three pay increases that the plaintiffs and all other air traffic controllers received. The parties do not dispute the calculation of this figure under the agreements.

### C. The Third Agreement: PATCO Re-hires

It soon became evident that the two labor agreements would incur costs far in excess of the $200 million set aside for flight controller salaries. To alleviate these anticipated cost overruns, the FAA and the NATCA negotiated changes to the new pay system and executed a third agreement in April, 1999. The third agreement is important to this case because it created the "PATCO re-hire" job category and established rules for converting the PATCO re-hires into the new pay system. The third agreement defined a PATCO re-hire as an individual who was hired under a special targeted hiring program *prior* to October 1, 1998, who was not at the FPL Grade of the facility of record as of October 1, 1998, but who had achieved FPL/CPC status at a previous facility.

Under the agreement, the plaintiffs are "PATCO re-hires." Prior to the PATCO strike, both plaintiffs had achieved FPL status at the Chicago ARTCC. They both were

re-hired in 1996, but at the FG–9 level. The defendant maintains that as of October 1, 1998, neither had regained FPL/CPC status at the Chicago center.

The agreements became effective October 1, 1998. At the time Plaintiffs filed their complaint, they were receiving $60,613 basic pay and were classified as level two Developmental Controllers. The plaintiffs' basic pay consists of the their initial conversion pay as of October 1, 1998, plus the three additional pay increases that all air traffic controllers received. Again, there is no dispute as to the calculation of these salaries.

Defendant claims that it has consistently applied the rules for re-entrant CPCs and PATCO re-hires. Defendant offers Ms. Ellen Cole, a female re-entrant CPC earning the higher salary level, and Mr. Clement Brown, a male PATCO re-hire earning the lower salary level, as evidence of its consistent application of the pay rules. While Defendant's examples are notable as rhetoric, they have no legal significance. More significantly, there is no evidence that any female re-entrant CPC failed to get the applicable increased pay, or that any male PATCO re-hire received more than that provided for ·in the agreements.

We turn now to the Equal Pay Act and its application to this FAA salary scheme.

### DISCUSSION

In 1963, Congress enacted the Equal Pay Act as an amendment to the Fair Labor Standards Act. In 1974, Congress extended the Act's provisions from private industry to government. The Act was passed in the hopes that it would help eliminate society's age-old belief in the inferiority of women and the economic and social consequences that flowed from that belief. *See Molden v. United States*, 11 Cl.Ct. 604, 608 (1987). The principle of the Equal Pay Act is that employees doing equal work should be paid equal wages, regardless of sex. *See EEOC v. Maricopa County Community College District*, 736 F.2d 510, 513 (9th Cir.1984).

The Act prohibits an employer from discriminating against employees of one sex by paying them less than employees of the opposite sex, when the employees perform equal work. 29 U.S.C. § 206(d)(1). The Act provides exceptions to this general prohibition where the payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. *Id.*

To establish a prima facie case under the Act, a plaintiff has the burden of proving that he or she performed work that is similar to that performed by employees of the opposite sex involving equal skill, effort, and responsibility; that the work was performed under similar working conditions; and that the employer paid different wages to employees of opposite sexes for such work. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). At the time the complaint was filed, Plaintiffs were earning $60,613; their male co-workers were earning $73,660, creating a differential of $13,047. For purposes of the government's summary judgment motion, the Court and the parties assume that the plaintiffs are performing equal work, and thus have established a prima facie case for a violation. In the context of the plaintiffs' cross-motion, however, Defendant challenges Plaintiffs' assertion that they and their three male co-workers perform the same duties.

Once a prima facie case has been established, the burden of proof shifts to the defendant to show that the wage disparities fall under one of the four exceptions to the Act. *See id.* at 196, 94 S.Ct. 2223. In its Motion for Summary Judgment, the United States argues that the pay disparity between the plaintiffs and the three male re-entrant CPCs falls under the fourth exception, a differential based on "any other factor other than sex." Under exception (iv), even if a man and woman are doing the same work for different pay, there is no violation if the wage difference stems from a factor other than gender. *See Wollenburg v. Comtech Manufacturing Co.*, 201 F.3d 973, 976 (7th Cir. 2000). The exception was created "to permit employers to utilize bona fide gender-neutral job classification systems." H.R.Rep. No. 88–309, at 3 (1963) *reprinted in* 1963

U.S.C.C.A.N. 687, 689. The Supreme Court has called the fourth exception a broad principle, one that clearly and explicitly states that a differential based on any factor other than sex is not a violation of the Act. *See County of Washington v. Gunther,* 452 U.S. 161, 171 n. 11, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). This fourth exception enables the employer to determine legitimate organizational needs and accomplish necessary organizational changes. *See Maxwell v. City of Tucson,* 803 F.2d 444, 447 (9th Cir.1986).

## I. Defendant's Motion for Summary Judgment

■ It is a common principle in Equal Pay Act case law that a bona-fide, gender-neutral personnel policy constitutes a factor other than sex. *See Washington,* 452 U.S. 161, 170–71, 101 S.Ct. 2242; *see also Maxwell,* 803 F.2d 444, 447; *Patkus v. Sangamon–Cass Consortium,* 769 F.2d 1251, 1261 (7th Cir.1985). The government claims that the pay differential here stems from the third collective bargaining agreement; it denies that the pay structure it established rests in any way on gender. To counter this, Plaintiffs contend implicitly in their papers, but quite explicitly in oral argument, that the government's pay and classification system cannot qualify as a bona-fide exception to the Act for two reasons. First, the system pays employees hired prior to October 1, 1998, less than those hired after that date, despite the fact that those hired before October 1 have more seniority and are equally, if not more, qualified than those hired after October 1. Second, the government implemented the system to save money, which Plaintiffs argue is not a legitimate business reason.

As a preliminary matter, we note that federal courts are not in agreement on whether a pay differential must be a product of a "legitimate" business reason. The Second, Sixth, Ninth, and Eleventh Circuits require the fourth affirmative defense to be related to legitimate business goals. *See, e.g., Aldrich v. Randolph Central School District,* 963 F.2d 520 (2nd Cir.1992); *EEOC. v. J.C. Penney Co.,* 843 F.2d 249 (6th Cir.1988); *Kouba v. Allstate Insurance Co.,* 691 F.2d 873 (9th Cir.1982); *Glenn v. General Motors Corp.,* 841 F.2d 1567 (11th Cir.1988). The Seventh and Eighth Circuits, on the other hand, believe that it is a sufficient defense if the differential is simply based on a gender neutral business justification, without examining whether the business reason is itself sound. *Fallon v. Illinois,* 882 F.2d 1206 (7th Cir.1989); *Strecker v. Grand Forks County Social Serv. Bd.,* 640 F.2d 96 (8th Cir.1981). The Federal Circuit has not addressed this point. However, we do not have to take a position on this circuit dispute. We will assume for argument's sake that the majority rule applies. What this Court must decide, therefore, is whether the defendant's system is an acceptable personnel policy despite the fact that to alleviate cost overruns it pays lower salaries to more senior employees, who may be equally or more qualified than later hires. An analysis of case law leads the Court to conclude that the government's reverse seniority system is a valid exception to the Act. We also conclude that the desire to control salary expenditures is a legitimate business reason.

### A. A Reverse Seniority System is a Bona-fide System.

■ The concept of a reverse seniority system, one that pays a higher salary to less senior employees than it pays to more senior employees, has been accepted by courts as a bona-fide personnel system. *See EEOC v. Aetna Ins. Co.,* 616 F.2d 719 (4th Cir.1980); *see also Patkus,* 769 F.2d 1251, 1261 (holding that in the absence of any evidence of pretext, a reorganization causing a male employee to earn more than his female predecessor qualified as a factor other than sex); *Strecker,* 640 F.2d 96, 103 (holding wage disparity caused by a dual classification system constituted factor other than sex even though capable people were underpaid), *overruled on other grounds by Robino v. Norton,* 682 F.2d 192 (8th Cir.1982). This is so even when the more senior employees are more qualified than newer employees, a circumstance not present in our case. *See Aetna,* 616 F.2d at 723.

In *EEOC v. Aetna Insurance Company,* a female plaintiff brought suit against her employer, claiming it violated the Equal Pay Act

when it paid a male co-worker, who held the same position as the plaintiff, a higher salary. 616 F.2d 719. Aetna claimed it had two distinct and separate merit systems, one for incoming employees and one for current employees. The plaintiff's male co-worker was a new hire, whereas the plaintiff had worked for the defendant for several years. As a result, the male co-worker was measured by one system, which was governed by annual company policy statements, regularly updated salary scales, and the individual's attributes. The plaintiff, on the other hand, was measured by the employee's starting salary, plus any merit and inflationary increases, and any adjustments made to assure that an employee's salary was at least at the minimum for his or her grade level.

The Fourth Circuit found that this dual compensation system qualified as a factor other than sex, despite the fact that it was not uncommon for new employees to be compensated more than senior employees. *Id.* at 723. The court stated that the pay disparity was attributable to the defendant's failure to monitor the salaries of its more tenured employees and to readjust them to current salary levels. *Id.* Stated otherwise, the disparity was due to the defendant's creation of a reverse seniority system that inadvertently resulted in different salaries for equal work.

In *Girdis v. EEOC,* a district court also validated a reverse seniority system. 688 F.Supp. 40, 45 (D.Mass.1987). The court examined the federal government's "time-in grade" restrictions, which prohibit federal employees from being promoted more than one grade level per year. The plaintiffs were women who, because of their previous employment with the federal government, were subject to the "time-in grade" restriction. The male hired by the EEOC was not subject to the "time-in grade" restriction because he had not been a prior employee of the federal government. As a result, the male was hired to perform the same duties, but at a higher grade level and salary than the more senior female plaintiffs. The court upheld this system, stating "a factor used to effectuate some business policy is not prohibited simply because a wage differential results." *Id.* at 46 (internal quotations omitted), *quoting Kouba v. Allstate Ins. Co.,* 691 F.2d 873, 876.

Defendant's system of differing pay and classification rules, which resulted from a series of collective bargaining agreements, is a bona-fide, gender-neutral, acceptable personnel policy that constitutes a factor other than sex under the Act. The pay disparity between the plaintiffs and their male co-workers resulted from a personnel policy in which gender played no part. Defendant's pay and classification system applies different rules to different employees based on date of hire, similar to the dual level system in *Aetna* and the "time-in grade" restrictions in *Girdis.* Furthermore, contrary to Plaintiffs' belief, inadvertent mal-administration of a bona-fide personnel policy—and there is no evidence that any exists in our case—does not in and of itself make the policy any less legitimate under the Act. *See Aetna,* 616 F.2d at 723.

### B. Non–Sex Based Cost Control is a Legitimate Business Reason.

As we have seen, many courts have taken the view that the judiciary's role under the Act is not to second-guess an employer's business judgment when that employer implements new personnel policies. In its analysis of the government's "time-in grade" restrictions, the *Girdis* court emphasized that the Act does not authorize a court to substitute its judgment for the judgment of an employer with regard to bona fide personnel programs, if the employer's policy does not discriminate on the basis of sex. *Girdis,* 688 F.Supp. at 46, *citing Washington v. Gunther,* 452 U.S. 161, 171, 101 S.Ct. 2242.

The Seventh Circuit echoed the *Girdis* court's opinion in *Patkus v. Sangamon–Cass Consortium,* 769 F.2d 1251. There, the Circuit Court upheld an employer's decision to revise its pay and classification system so that new male employees were paid a higher salary than a former female employee for doing the same job. The court reiterated Congress' concern that "bona fide job-evaluation systems used by American businesses not be disrupted." *Id.* at 1261. The Court stated, "We view the right of an employer to change and revise the job-evaluation and pay

system in use as falling within this area of congressional concern." *Id.*

Those courts that require the defendant to show that its personnel policy was implemented for business related reasons have accepted systems motivated by cost control, of course always with the proviso that the system is not sex-based. *See Belfi v. Prendergast,* 191 F.3d 129, 136 (2nd Cir.1999); *EEOC v. J.C. Penney,* 843 F.2d 249, 253. Additionally, the Act's legislative history suggests that wage differentials implicating the total cost of employing both men and women are exempt from the Act's scope:

> It is the intention of the committee that where it can be shown that, on the basis of all of the elements of the employment costs of both men and women, an employer will be economically penalized by the elimination of a wage differential, the Secretary can permit an exception similar to those he can permit for a bona fide seniority system or other exception . . .

S.Rep. No. 88–176, 1st Sess., at 4 (1963).

Even in applying the less deferential view for purposes of this case only, the Court has no trouble concluding that an employer's desire to save money constitutes a legitimate business related reason. As long it is not based upon the lesser cost of employing one sex versus the other, an employer's attempt to minimize cost is a valid business reason for implementing a pay and classification system. What, indeed, could be more basic to private enterprise than minimizing costs while maximizing income? Achieving economy in government, however elusive a goal, is also a most desirable aspiration. While Congress might be accused of wasting taxpayers' money, could a court read into the Act a legislative intent to preclude cost-savings as a legitimate business justification for the federal government? His fervor notwithstanding, Plaintiffs' counsel has not offered any support in law or reason for this position.

The defendant enacted its system to adhere to earlier collective bargaining agreements and to alleviate cost overruns caused by those agreements. There is no evidence of pretext or discrimination. Defendant has applied this system in a consistent and gender-neutral manner. Defendant's system is valid.

### C. Plaintiffs' Reliance on Molden v. United States.

Plaintiffs rely on *Molden v. U.S.,* contending that it invalidates personnel policies that might otherwise be construed as bona-fide, gender-neutral compensation schemes if the responsible official knew of the pay disparity and failed to take corrective action. 11 Cl. Ct. 604 (1987). *Molden,* of course, is not binding on this Court. But, more fundamentally, we believe the plaintiffs over-read the case.

*Molden* involved female plaintiffs alleging violations of the Act when they did not receive deserved promotions due to a government freeze on promoting employees to Grade 12 level positions. The plaintiffs were thereby forced to remain in a lower grade, doing work equivalent to that of male employees at the GS–12 level, a prima facie violation of the Act. The government claimed that it implemented the promotion freeze to enable it to correct the frequent "overgrading" of employees and to institute new classification standards. The freeze and the new classification system were legitimate employment practices, which were not based on sex, and therefore fell under exception (iv). The court ultimately invalidated the pay disparity caused by the five-year promotion freeze as a violation of the Act. Because the defendant was aware of the pay disparity, and failed to remedy the situation within a reasonable time, the court held that the discrepancy in pay between male and female employees was illegal. *Id.* at 613.

However, one must view the *Molden* decision in light of its facts. First, the government conceded that its classification system was not bona-fide from its inception. That was the reason it instituted the promotion freeze. Second, there was evidence of sexual discrimination in the application of the promotion freeze. Male co-workers were promoted despite the alleged freeze, while female employees, including the plaintiffs, were not. One could therefore say that the promotion freeze applied to women, but not men, a patent violation of the Act. Finally,

the government failed to correct inequities in the personnel system:

> It was the responsible official's inability to correct the wage discrepancies in a timely manner that removed defendant's job classification from it's otherwise bona fide status, and gave rise to the violation of the Equal Pay Act. The existence of the wage disparities, along with the fact that the disparities were known to the responsible officials, and the fact that the discrepancies have not been remedied, removes [sic] the bona fide status from the defendant's job classification system. Therefore, defendant's implementation of the job classification standard cannot fall under exception (iv) of the Equal Pay Act.

*Molden,* 11 Cl.Ct. at 613.

In the present case, there is no evidence that the defendant's system was not properly implemented. Plaintiffs and their male counterparts received the salary that was appropriate under the agreements. There is no evidence that the male co-workers received any payment that was improperly denied to the plaintiffs. Certainly, no one would dispute *Molden's* rationale that a job classification system must be gender-neutral in its application as well as in its form. The court was apparently prepared to excuse under exception (iv) a temporary pay freeze as a legitimate business reason, even if it resulted in a continued lower income for the female employees. But after five years without correction, the court could no longer condone having the female employees be the uncompensated victims of government inaction:

> [F]ive years of administrative efforts to rectify seven years of wage discrimination in the present case is deemed an unreasonable amount of time. By utilizing the plaintiffs to do the work which their co-workers at the GS–12 level were doing, the defendant benefits from the acquired knowledge and expertise of the plaintiffs while not fairly compensating them at a level equal to that of their male co-workers.

*Id.*

Nothing in our record suggests that Defendant's pay and classification system was anything comparable to *Molden.*

## II. Plaintiffs' Cross–Motion for Summary Judgment

In their cross-motion, Plaintiffs claim that they have established a prima facie case of an Equal Pay Act violation, and that Defendant has failed to rebut their case. As we have noted, to make a prima facie showing the plaintiffs have to establish among other things that they perform work that is similar to that performed by the three male co-workers, involving equal skill, effort, and responsibility, and that they perform the work under similar working conditions. Unfortunately, the plaintiffs' motion has two different, but related fatal defects. First, Plaintiffs have failed to make a factual showing. Equally serious, Defendant has presented evidence contesting the factual validity of the "equal work" element, thus raising a dispute of material fact that itself precludes summary judgment. Rule 56(c) of the Court of Federal Claims provides that in order for a motion for summary judgment to be granted, the moving party must demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505.

Originally, Plaintiffs alleged in the Consolidated Statement of Proposed Uncontroverted Fact (our version of the Rule 56 showing), that the position descriptions of the plaintiffs and the three male co-workers were identical or substantially identical. Plaintiffs made this assertion without citing to any supporting authority or to any portion of the record. The government contested the claim. At oral argument, Plaintiffs were given an opportunity to supplement the statement of facts with supporting materials or citations to the record. Again, Plaintiffs asserted—but again without support—that they had identical or greater qualifications than the three male co-workers.

Following argument, Plaintiffs offered documentary evidence to support their "equal work" claim. They asserted that they had been certified on several "D-side" positions prior to October 1, 1998. D-side positions

assist the radar controller in the operation of the sector. The plaintiffs' theory is that their pre-October 1998 D-side certification establishes a prima facie showing of "equal work." Defendant does not dispute that Plaintiffs were certified for D-side positions prior to October 1998, but argues that those certifications are irrelevant to the case. To support its counter-argument, Defendant offers the declaration of Michael S. Pesola, a support specialist in the Training Department of the Chicago ARTCC. Mr. Pesola states that once Plaintiffs were certified for the D-side positions, they had a certain amount of time to obtain certification for "R-side" positions. R-side positions, according to Mr. Pesola, are the most complex positions and demand the most skill because they involve giving actual control instructions to the aircraft. If a Developmental Controller does not obtain R-side certification within the allotted training time, that controller is either removed from employment or reassigned to another area. When reassigned, the controller's previous certifications do not transfer to the new area, because each area has a different volume of air traffic and a different complexity level.

Mr. Pesola further stated that Ms. Murphy was certified on four D-side positions in the Northeast area between March 1998 and November 1998. Ms. Murphy was then able to begin training for the corresponding R-side positions. She did not, however, obtain the R-side certification within the target number of training hours. Consequently, she lost her previous D-side certification, and was reassigned to the West area, where she is currently performing A-side duties. Mr. Pesola explained that A-side duties consist of identifying and delivering flight information strips to the correct D-side or R-side controller. The A-side positions are not as demanding and do not require the same skill level as the D-side and R-side positions.

According to Mr. Pesola's declaration, Ms. Lissak was certified on her first two D—side positions in the Northwest area between September and December of 1996. She thus became eligible for R-side training. But, like Ms. Murphy, she did not obtain her R-side certification within the allotted training time. She was reassigned to the North area, where she began training for D-side positions in December 1997. Her training was suspended because she was unable to obtain her certification. Eventually she was medically disqualified from performing the duties of an air traffic control specialist. Thus, it is the government's position that neither of the plaintiffs has been certified and actively performing D-side duties since October 1, 1998.

Analytically, then, the plaintiffs have offered facts in support of their prima facie showing that the government contends are irrelevant. It is obviously the plaintiffs' responsibility to establish the relevancy of their D-side proffer. Unfortunately, the plaintiffs' response to Defendant's argument is insufficient. First, they argue that under the FAA's pay structure, the fact that Plaintiffs were reassigned to new areas after they certified on the D-side positions is completely irrelevant because the promotions are based on original certifications, not on subsequent in-facility transfers of specialization areas. Next, they assert that the D-side certifications have no bearing whatsoever on the pay disparity at issue because Plaintiffs were paid less than male employees for performing identical jobs. Unfortunately, Plaintiffs have failed to substantiate these rebuttal arguments with any citation to the record or any other authority.

In the end, nothing but rhetoric supports their assertion that they performed the same duties as the male co-workers. Even viewing Plaintiffs' case on the "equal work" issue in its most generous light, at most they have presented their side of a factual dispute that cannot be resolved in a summary judgment proceeding, but only at trial. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In either event, their summary judgment motion fails.

### CONCLUSION

Consequently, **the Court GRANTS Defendant's Motion for Summary Judgment, and DENIES Plaintiffs' Cross–Motion for Summary Judgment.** This case is hereby dismissed with prejudice. **Each party is to bear its own costs.**

IT IS SO ORDERED.