NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**KATHLEEN M. KAPLAN,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2017-2496

_____

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00067-EGB, Senior Judge Eric G. Bruggink.

_____

Decided: April 10, 2018

_____

KATHLEEN M. KAPLAN, Arlington, VA, pro se.

DANIEL KENNETH GREENE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by CHAD A. READLER, ROBERT E. KIRSCHMAN, JR., REGINALD T. BLADES, JR.

_____

Before PROST, *Chief Judge,* WALLACH, and TARANTO, *Circuit Judges.*

PER CURIAM.

Dr. Kathleen Kaplan, a federal government employee, brought this action in the United States Court of Federal Claims, alleging that her pay violated the statutory bar on sex discrimination stated in the Equal Pay Act, 29 U.S.C. § 206. The Court of Federal Claims found that the government had proven its affirmative defense—that it paid Dr. Kaplan in compliance with a proper merit-based compensation system—and accordingly entered judgment in the government's favor. *Kaplan v. United States*, 133 Fed. Cl. 235 (2017). We affirm.

I

A

Dr. Kaplan held several positions at the Air Force Office of Scientific Research, which is a part of the Air Force Research Laboratory that manages research investments for the Air Force. She began working for the Office of Scientific Research in 2005 as a program manager. She became the deputy director of the Physics & Electronics Directorate of the Office on January 10, 2011, and then served as a program officer in the Information, Decision, & Complex Networks division of the Office from February 2013 until her termination in November 2016.

During her time at the Office, Dr. Kaplan was paid according to a compensation system called the Laboratory Personnel Demonstration Project (Lab Demo). The Lab Demo system separated employees into four groups (the DR I–IV "broadband levels") rather than the usual fifteen federal-government General Schedule (GS) grades. Within each level, it set salaries using a "contribution-based compensation system," which was designed to "go[] beyond the traditional performance-based personnel management system" and reward "contribution[s] to the laboratory mission, rather than how well the employee performed a job, as defined by a performance plan." J.A.

84. The Lab Demo system also classified employees into various career paths. Dr. Kaplan was in the science and engineering (DR) career path.

Under the Lab Demo system, employees were evaluated and scored each year based on four factors: problem solving, communication, technology management, and teamwork and leadership. The governing Air Force Research Laboratory Manual sets forth a "rubric" that elaborates on each of the four factors as applied to particular career paths and broadband levels. The scores for each factor were averaged to determine an employee's Overall Contribution Score, which, along with a Standard Pay Line, determined the employee's possible pay increase for the next year. The Standard Pay Line was a linear graph correlating Overall Contribution Scores to salaries for a given career path in a given year. The Standard Pay Line helped identify whether an employee was being paid correctly, too little, or too much based on the employee's Overall Contribution Score. Pay was correct if within 0.3 points of the relevant Standard Pay Line value.

The Office's process for determining an employee's Overall Contribution Score involved several levels of review and assessment. At the end of an evaluation period, the employee first performed a self-assessment of her contributions. The employee's first-level supervisor reviewed the self-assessment and prepared a preliminary assessment. The supervisor took the preliminary assessment to a First-Level Meeting of Managers, where first-level supervisors of similar employees met with their respective second-level supervisors to discuss the preliminary assessments and adjust each employee's scores for the four prescribed factors. Next, a Pay Pool Manager responsible for the employee took part in a second Meeting of Managers, during which various Pay Pool Managers met and compared scores for a large number of employees to ensure consistent application. If the scoring

was not consistent, the Pay Pool Manager could direct a subordinate manager to take a second look at the employee's contributions. Once the Pay Pool Manager had arrived at a final set of scores, the first-level supervisor informed the employee, furnishing a Form 280 that explained the decisions made in the Meetings of Managers and the reasons for the scores. The employee could file a grievance, but if there were no successful grievance, the employee's Overall Contribution Score was set and compared to the Standard Pay Line for the employee's career path to determine whether the employee was being correctly paid.

The Lab Demo system also included several forms of bonuses to reward exceptional performance or compensate for underpayment. One was a "broadband IV" bonus to compensate employees whose contributions put their projected salary above the usual GS-15/step 10 maximum salary. Another was a "CCS bonus" to reward important yet unsustainable contributions.

B

In January, 2014, Dr. Kaplan filed a complaint with the Court of Federal Claims under the Equal Pay Act, 29 U.S.C. § 206, alleging that she had been underpaid relative to her male colleagues under the specific standards for comparison set out in that Act. She submitted salary information for several men at each of the three positions she held within the Office of Scientific Research. *Kaplan*, 133 Fed. Cl. at 240. In each instance, the male comparators earned higher salaries than Dr. Kaplan. *Id*.

In December 2016, the court held a trial, at which sixteen witnesses testified. *Id*. at 242. In its eventual findings, the court credited Dr. Kaplan's evidence that she was paid less than her comparable male colleagues at each of her three positions, but the court declined to decide whether or not she performed work requiring equal skill, effort, and responsibility (considerations specified in

the Equal Pay Act). *Id.* at 244. Instead, based on the evidence presented by the government, the court determined that the Lab Demo system was a "legitimate and comprehensive merit system that adequately explains the difference in pay between Dr. Kaplan and her alleged male comparators." *Id.* As a basis for that determination, the court noted that, while the Lab Demo system allowed the first-level supervisor's assessments to be "to some extent subjective," the multi-tiered review process "work[ed] towards introducing objective points of comparison." *Id.* at 247. The court also considered testimony from many of Dr. Kaplan's supervisors that the identified differences in pay were the result of her contributions, as assessed under the official rubric, and that her sex was not a factor. *Id.* at 245. In addition, the court credited the government's evidence of Dr. Kaplan's unfavorable reviews by the Air Force Scientific Advisory Board—an "independent, objective" body. *Id.* at 247.

As a result, the court concluded that the Lab Demo system was as "free from subjectivity as one could reasonably expect," *id.* at 244, and that "the government was able to demonstrate" that all of Dr. Kaplan's first-level supervisors "used the required rubric and did not consider Dr. Kaplan's gender while preparing their assessments," *id.* at 245. Because the government had established an affirmative defense to any potential case of sex-based wage discrimination Dr. Kaplan might prove, the court ruled for the government. *Id.* at 248.

The court issued its final judgment on June 30, 2017, and Dr. Kaplan filed her notice of appeal on August 24, 2017, within the 60-day time limit. 28 U.S.C. §§ 2522, 2107(b)(1). We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1295(a)(3).

II

We review the trial court's legal conclusions de novo and its findings of fact for clear error. *Rasmuson v. U.S.,*

807 F.3d 1343, 1345 (Fed. Cir. 2015) (citation omitted). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1984).

The Equal Pay Act, 29 U.S.C. § 206, states:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . .

29 U.S.C. § 206(d)(1). The basic two-part proof scheme under that statute is not in dispute here. As relevant here, a plaintiff may establish a prima facie case of a violation by showing that she was paid "at a rate less than the rate" of her male counterparts for "work . . . requir[ing] equal skill, effort, and responsibility"; and if that is shown, the burden shifts to the government to prove that the payment system in question falls into one of the four enumerated exceptions. *See, e.g., Yant v. United States*, 588 F.3d 1369, 1372 (Fed. Cir. 2009). Proof of payment pursuant to a merit-based system does not require proof that the system is entirely free from subjectivity. *See, e.g., EEOC v. Aetna Ins. Co.*, 616 F.2d 719,

726 (4th Cir. 1980) ("An element of subjectivity is essentially inevitable in employment decisions; provided that there are demonstrable reasons for the decision, unrelated to sex, subjectivity is permissible."); *Harrison-Pepper v. Miami Univ.*, 103 F. App'x 596, 601 (6th Cir. 2004) ("use of subjective criteria does not preclude [a] merit-based system from constituting an affirmative defense").

A

Dr. Kaplan makes several arguments that are essentially arguments about the initial stage, concerning prima facie proof of a violation. But those arguments are not a basis for disturbing the judgment on appeal here. The Court of Federal Claims assumed proof of a prima facie violation and determined that the government established an affirmative defense. Dr. Kaplan's arguments about the prima facie case do not undermine the determination of an affirmative defense, which suffices to reject the Equal Pay Act claim.

For example, Dr. Kaplan argues that she was paid less than Dr. Robert Bonneau after she took over for him as the program officer in charge of the Systems & Software technology portfolio. Dr. Kaplan cites an Equal Employment Opportunity Commission regulation stating that when an "employee of one sex is hired or assigned to a particular job to replace an employee of the opposite sex but receives a lower rate of pay than the person replaced, a prima facie violation of the EPA exists." 29 CFR § 1620.13(b)(2). This point on its face bears on the prima facie case, and it does nothing to undermine the government's affirmative defense that the Lab Demo system is a merit system. In any event, we note that the Court of Federal Claims found that "[t]here is no reason to think that plaintiff was treated any differently [] than anyone else in the agency who moved between positions." *Kaplan*, 133 Fed. Cl. at 245.

Similarly, Dr. Kaplan suggests that the court violated her due process rights by failing to individually address her arguments that she was paid less than her male counterpart at each of her positions within the Office of Scientific Research. On its face that contention seems to bear only on the existence of a prima facie case, which the Court of Federal Claims accepted. Dr. Kaplan has not explained how it bears on whether the trial court erred in finding that a merit system accounted for the differences Dr. Kaplan identified. We have been shown no basis for requiring a more job-specific inquiry than the trial court made in finding that Dr. Kaplan was consistently paid pursuant to the Lab Demo system during her entire tenure at the Office and the system was a "merit system."

B

Dr. Kaplan also argues that the trial court erred in concluding that the Lab Demo system is a merit system. Her broadest argument is that the Equal Pay Act requires a present-tense focus of the comparison of the specified considerations (work, required skills, etc.) and that the Lab Demo system is counter to that focus because it sets compensation based on a look-back at contributions. We understand this as an argument that the Lab Demo system cannot be "merit based" for that reason; otherwise, the argument would bear only on the prima facie case, which was not the basis for the judgment in the trial court. But we have been presented no justification for a rule of law that would preclude a "merit" system from including sex-neutral assessments of facts such as recent performance and contribution to the employer's mission, at least where, as here, the updating process for pay evaluation is frequent.

As for the specifics of the Lab Demo system at issue here, Dr. Kaplan supplies nothing that would justify reversal of the trial court's crediting of the testimony of her supervisors and other evidence that this was a merit

system under the Equal Pay Act. She argues that the Lab Demo system is a "pyramid scheme" using "completely subjective scoring" and that the four-factor contribution scores "do not make any sense," and she contends that the term "contribution" is not defined in the Air Force Research Laboratory Manual and that "performance" should have been used as the measure instead. We see no error, however, in the trial court's determination that the Lab Demo system, with its choice of "contribution" over "performance" and its detailed rubric for evaluating each of the four contribution factors, broken down by career path and broadband level, qualifies as a merit system with a degree of objectivity suitable to the kind of personnel evaluation at issue here. *Kaplan*, 133 Fed. Cl. at 237.

Regarding the application of the Lab Demo system in operation, Dr. Kaplan has not shown that the Office failed to abide by or apply the standards of the system. She makes one focused argument: that she was denied advancement opportunities offered to her male counterparts—specifically, opportunities to manage multiple technical research portfolios, which in turn allowed her male counterparts to achieve higher contribution scores under the Lab Demo system. But the trial court considered the evidence and rejected the contention. *Id.* at 248 n.14. The evidence supports the rejection. It showed that Dr. Kaplan had asked to manage three technical portfolios during her time as a deputy director and that there were sex-neutral explanations for denial of those requests: in two cases, she lacked the technical qualifications necessary to manage the portfolio; and in the third case the requested portfolio was already being managed by an employee in a different directorate.

We have considered the rest of Dr. Kaplan's arguments and find them similarly unpersuasive.

### III

For the foregoing reasons we affirm the judgment of the Court of Federal Claims.

No costs.

**AFFIRMED**