Judith A. MANSFIELD, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 05–472C.

United States Court of Federal Claims.

June 30, 2006.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WILLIAMS, Judge.

Plaintiff Judith A. Mansfield, a female employee at the Library of Congress (LOC), alleges that the LOC violated the Equal Pay Act by paying male employees higher wages for doing substantially the same work under similar circumstances. Specifically, Plaintiff claims that she was paid less than four male employees—her supervisor when she was temporarily promoted to his position, two co-workers in the same position and a co-worker she supervised. Additionally, Plaintiff claims that the LOC violated the Equal Pay Act by failing to follow the recommendation of a classification consultant to upgrade her position. Plaintiff seeks back pay, benefits and a retroactive promotion.

This matter comes before the Court on Defendant's motion for summary judgment.[1] Defendant argues that any pay disparity between Plaintiff's pay and that of her male supervisor and co-workers was the result of legitimate business reasons or factors other than gender. Because the record on summary judgment does not establish that Defendant's articulated reasons justified the pay disparity and because there are genuine issues of material fact regarding the reasons for the disparity, Defendant's motion is denied.[2]

### Factual Background[3]

Plaintiff has been employed by the LOC since July 1, 1969, and has served as the Chief of the Arts and Sciences Cataloging Division (ASCD) since May 1988. Compl. ¶¶ 1, 5, 6; Pl.'s App. at 36, 40. Prior to this, Plaintiff served as an Automated Operations

Bruce A. Fredrickson, Webster, Fredrickson & Brackshaw, Washington, D.C., for Plaintiff.

Douglas K. Mickle, Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

1. Defendant filed this motion in lieu of an answer prior to the filing of the Joint Preliminary Status Report or the conduct of any discovery.

2. Further, this motion is properly denied pursuant to Rule 56(f) of the Rules of the Court of Federal Claims in that Plaintiff has had no formal discovery and no opportunity to probe Defendant's affirmative defenses. Plaintiff has filed the Rule 56(f) affidavit of its counsel, Bruce A. Fredrickson, outlining why it requires adequate discovery before the Court can rule on Defendant's motion. Aff't of Bruce A. Fredrickson

(Dec. 13, 2005) ¶ 3, Pl.'s App. at 2. Upon review of that affidavit and the record on the motion, the Court concludes that discovery is necessary but that it would serve no purpose to defer the motion for summary judgment pending discovery. Rather, full-blown discovery is authorized, and this case shall proceed to trial. *Jade Trading v. United States*, 60 Fed.Cl. 558, 559 (2004).

3. This factual background is derived from the Complaint and the Appendices filed in conjunction with the pending motion.

Coordinator in Library Services, pay grade GS–13, Step 10, where she worked under the supervision of the Director of Cataloging, Mr. Beacher Wiggins. Compl. ¶ 6; Wiggins Decl. ¶ 6, Def.'s App. at 7, 8. Plaintiff was selected for her current position, Chief of ASCD, pay grade GS–15, by Mr. Wiggins in 1998. Compl. ¶ 6; Wiggins Decl. ¶ 6, Def.'s App. at 8.

At that time, there were eight divisions under Mr. Wiggins' supervision: Regional and Cooperative Cataloging (senior level pay grade),[4] Cataloging Policy and Support (senior level pay grade), Social Sciences Cataloging, History and Literature Cataloging, Arts and Sciences Cataloging, Special Materials Cataloging, Cataloging in Publication, and Decimal Classification. Pl.'s App. at 120. The Chief of each division reported directly to Mr. Wiggins. *Id.*

### Plaintiff's Tenure As Acting Director for Cataloging: September 2002—June 2004

In September 2002, then Associate Librarian for Library Services, Winston Tabb, retired. Def.'s App. at 8, Wiggins Decl. ¶ 4. Mr. Tabb was Mr. Wiggins' direct supervisor. *Id.* Until Mr. Tabb's replacement was appointed in August 2003, the LOC detailed Mr. Wiggins to the position of Acting Associate Librarian for Library Services. While Mr. Wiggins was detailed, he assigned Plaintiff to his former position as Acting Director for Cataloging. *Id.* ¶¶ 5, 7. Plaintiff served in this position from September 2002 until June 2004 and was paid at the Senior Level (SL) pay grade for two nonconsecutive periods of 120 days, from September 2002–January 2003, and February–May 2004. Wiggins Decl. ¶¶ 7–10, Def.'s App. at 9–10.[5] At all other times Plaintiff served in this position, she was paid at the GS–15 level. *Id.*

Mr. Wiggins explained Plaintiff's temporary promotion as follows:

> I . . . temporarily promoted [Plaintiff] to the SL pay grade because as Acting Director she would be performing the full range of duties of the position, which is an SL position. Temporary promotions are customary for any detail of a manager or staff member to a higher-graded position.
> \* \* \* \*
> Under Library of Congress regulations, a staff member may only be temporarily promoted for up to 120 days during any twelve-month period. Temporary promotions to the SL pay grade in excess of 120 days are restricted to those situations where a permanent candidate for the position is being sought and the position is being posted. Therefore, since the position of Director for Cataloging was not being filled, Ms. Mansfield's temporary promotion could not exceed 120 days.

Wiggins Decl. ¶¶ 7–8, Def.'s App. at 9. Mr. Wiggins continued to assign Plaintiff the duties of Acting Director after her first 120–day promotion because he "wanted continuity of a single manager leading the directorate and . . . had been very pleased with her work during her first 120 days as Acting Director." Wiggins Decl. ¶ 9, Def.'s App. at 10. He stated:

> Ms. Mansfield's gender had nothing to do with my decision to keep her assigned to the duties of Acting Director nor did it have anything to do with the amount of pay she received while assigned to these duties. Moreover, . . . she could have declined to continue as Acting Director when the temporary promotion ended. However-

---

4. "The Library's Senior Level Executive System has a minimum and maximum pay range as set by law. The minimum is linked to the General Schedule, specifically 120 percent of the salary for a GS–15/1, and the maximum is equivalent to level IV of the Executive Schedule." Library of Congress Regulation (LCR) 2017–2.1, Sec. 14, Pl.'s App. at 133. LOC's Senior Level Executive System consists of four pay "bands": SL–1, SL–2, SL–3, and SL–4. LCR 2017–2.1, Sec. 14, Pl.'s App. at 133. These bands are linked to the federal government's General Schedule as follows: an SL–1's rate of pay is equivalent to 120% of the GS–15, Step 1 rate of pay; an SL–2's rate of pay, to 128.51% of the GS–15, Step 1 rate; an SL–3's rate of pay, to 139.51% of the GS–15, Step 1 rate; and an SL–4's rate of pay, to 162.44% of the GS–15, Step 1 rate. *Id.*

5. Plaintiff's SL pay was set by the Library's Human Resources Services' (HRS) directorate. *Id.* ¶ 7. Based on Plaintiff's GS–15 rate of pay of $104,336, HRS set Plaintiff's rate of SL pay at $110,472 for her first 120–day temporary promotion, and based on Plaintiff's GS–15 rate of pay of $117,630, HRS set Plaintiff's rate of SL pay at $125,969 for her second 120–day temporary promotion. Pl.'s App. at 38, 35.

er, based on Ms. Mansfield's explicit agreement in continuing to perform the duties of Acting Director and my desire to have her continue, I allowed her to do so.

*Id.*

During Plaintiff's tenure as Acting Director for Cataloging, Plaintiff was the immediate supervisor of a male employee—John Byrum, Chief of the Regional and Cooperative Cataloging Division, who was paid at the Senior Level. Wiggins Decl. ¶ 16, Def.'s App. at 13. In June 2004, Plaintiff returned to performing the duties of Chief of ASCD. *Id.* ¶ 10.

### Mr. Wiggins' Prior Temporary Promotion to Acting Director for Cataloging

In 1995, prior to his permanent appointment as the Director for Cataloging, Mr. Wiggins also was temporarily promoted to Acting Director for Cataloging. From January 1995 to June 1997, he served as Acting Director for Cataloging and was temporarily promoted for three 120–day periods, and paid at the SL grade. Other than during these periods, he was paid his regular GS–15 pay. Wiggins Decl. ¶ 3, Def.'s App. at 7–8. Mr. Wiggins received his first temporary promotion on January 16, 1995, his second temporary promotion on November 12, 1995, and his third temporary promotion on November 10, 1996. Pl.'s App. at 64–68. The LOC posted a vacancy announcement for the Director for Cataloging position on September 17, 1996. Def.'s Reply, App. at 48. Mr. Wiggins' third temporary promotion was extended on March 10, 1997, until June 8, 1997, when he received his permanent promotion. Pl.'s App. at 158, 64.

### The Recommendation to Reclassify the Chief Positions to Senior Level Status in August 2003

Prior to his appointment as Acting Associate Librarian, Mr. Wiggins requested that

HRS review the position descriptions for the eight Chief positions in Cataloging because he "had long thought that the Chief positions in Cataloging merited being classified at the SL grade and at the time, three [6] of the Chiefs were already at the SL grade and the remaining five positions, including Ms. Mansfield's position, were at the GS–15 pay grade." Wiggins Decl. ¶ 11, Def.'s App. at 11. Therefore, in April 2003, HRS hired a classification consultant to review the Chief positions. *Id.* The consultant recommended that four of the GS–15 Chief positions, Plaintiff's position, ASCD, as well as Chief of the History and Literature Cataloging Division, Social Sciences Cataloging Division and Special Materials Cataloging Division, be upgraded to SL pay grade positions. *Id.*[7] The consultant explained:

> [The four positions recommended for reclassification to SL] manage divisions with substantial resources, i.e., diverse functional responsibilities, a multi-million dollar budget, and large staffs. This diversity requires exceptional administrative skill to coordinate and integrate the various functions and resolve broad internal management issues, e.g., managing change, internal restructuring of functions, automation, cost reduction, and initiating, changing, or discontinuing ongoing projects. Those positions are recommended for consideration for elevation to senior level.

Pl.'s App. at 28. The classification consultant explained that the remaining two Division Chief positions "differ[ed] significantly from the [others] in terms of scope and complexity of functions managed," and therefore, did not recommend them for elevation to SL. *Id.*

In August 2003, the Director of HRS submitted the classifier's recommendation for

---

6. Other documents in the record state that only two of the Division Chief positions were SL positions. In a memorandum dated April 25, 2003, to Teri Smith, Director for HRS, Mr. Wiggins states that "[t]wo of the eight Cataloging Directorate chief positions are already graded SL 1410." Pl.'s App. at 32. In addition, the classification consultant's evaluation of the eight Division Chief positions indicates that only two of the Division Chief positions were SL positions. Pl.'s App. at 22–26.

7. There are no Office of Personnel Management standards for evaluating positions proposed for senior level, and the consultant indicated that as a matter of general practice "senior level is appropriate for managerial positions which clearly exceed the scope and complexity of GS–15." Pl.'s App. at 23.

the position upgrades to the newly appointed Associate Librarian for Library Services, Deanna Marcum, for her consideration. Ms. Marcum believed that the Library Services' budget could not support the additional SL positions and therefore did not approve the recommended upgrades. Wiggins Decl. ¶ 12, Def.'s App. at 11. As a result, HRS never reclassified or upgraded the four Cataloging Chief positions. *Id.*

**Plaintiff's Tenure as Assistant Director For Bibliographic Access: August 2004—March 2005**

On July 15, 2004, Mr. Wiggins sent an e-mail to the Division Chiefs regarding potential new Assistant Director positions, stating in pertinent part:

> Directors are to let Deanna know by next week their views on the assistant director positions. Deanna's preference is that the assistant director serve in [that] capacity with collateral duties. She sees the duties of the assist directors as primarily a coordinating function. Directors are to let her know if we disagree and what the rationale is for having the position be full time. I responded in the meeting that I want the assist director for acq and the assist for cat to be full time positions. I've taken on collateral duties in the past—to do so is draining.

Pl.'s App. at 154. Mr. Wiggins advocated that the assistant director positions be full-time. *Id.* On August 4, 2004, Mr. Wiggins informed the Division Chiefs via e-mail that the assistant director positions would not be full-time stating in pertinent part:

> Deanna has determined that she cannot agree to any assistant director positions being full time.... Deanna stated that after experimenting with assistant directors in collateral roles for a while, we can later reevaluate its effectiveness. It is not clear if the concept of director/deputy director will come to be, later in fy05.

Pl.'s App. at 126.

On August 6, 2004, Ms. Marcum announced the appointments of Beacher Wiggins as Acting Director for Acquisitions, Plaintiff as Assistant Director for Bibliographic Access, Steve Herman as Assistant Director for Collections Management and Mark Dimunation as Assistant Director for Special Collections and Services. Pl.'s Opp. App. at 34, 119; Wiggins Decl. ¶ 14, Def.'s App. at 12. Ms. Marcum stated that she was "grateful to each of these assistant directors for taking on additional responsibilities." *Id.*

While serving as Assistant Director for Bibliographic Access, Plaintiff, who was paid at the GS–15 level, earned less than other Assistant Directors, Messrs. Herman and Dimunation. She also served as the immediate supervisor of a Senior Level male employee—John Byrum, Chief of the Regional and Cooperative Cataloging Division, who was paid at the SL grade and earned more.[8] Wiggins Decl. ¶ 16, Def.'s App. at 13.

By letter dated March 15, 2005, Plaintiff advised the Librarian of Congress that she had been paid less than her male counterparts in violation of the EPA and Title VII and requested "to negotiate a satisfactory resolution." Pl.'s App. at 156.[9]

Less than a month later, on April 13, 2005, Ms. Marcum sent a memorandum to the LOC's Directors and Division Chiefs explaining that she had eliminated the three Assistant Director positions, which had been created eight months earlier. Pl.'s App. at 121. The memorandum stated:

> When we realigned Library Services last July, I mentioned that the organizational structure would be adjusted as needed. We were trying something new and we would adjust as experience required. At my suggestion, the directors of Acquisitions and Bibliographic Access and Collections and Services named three division chiefs to take on collateral duties as assistant directors, but these positions have not worked out as intended, so I have eliminated the three coordinating positions. I

8. Prior to January 9, 2005, Plaintiff's salary was $120,280, and Mr. Byrum's salary was $145,600. Pl.'s App. at 36, 59. On January 9, 2005, Plaintiff's salary was raised to $124,740, and Mr. Byrum's, to $149,200. Pl.'s App. at 36, 59.

9. Plaintiff stated that if she did not receive a response to her letter, she would "assume [the Library had] no interest in resolving this matter privately." Pl.'s App. at 156.

have asked the directors of the two largest units to look anew at the organizational structure that best fits the directorate's needs. The result is likely to be that more high-level staff will be asked to take on collateral duties. We will continue to monitor the workloads of the directorates and make structural changes as needed.

Pl.'s App. at 121.

## Discussion

### Jurisdiction

The Tucker Act, 28 U.S.C. § 1491(a)(1), both confers jurisdiction upon the United States Court of Federal Claims and waives sovereign immunity with respect to certain actions for monetary relief brought against the United States. *See United States v. Mitchell,* 463 U.S. 206, 212–18, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005). Under the Tucker Act, sovereign immunity is waived for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 29 U.S.C. § 1491(a)(1) (2000).

The United States Court of Federal Claims "has jurisdiction over suits founded on the Equal Pay Act, 29 U.S.C. § 206, under the Tucker Act...." *Harbuck v. United States,* 58 Fed.Cl. 266, 267–68 (2003), *aff'd,* 378 F.3d 1324, 1330 (Fed.Cir.2004), *cert. denied,* 543 U.S. 1153, 125 S.Ct. 1386, 161 L.Ed.2d 118 (2005) (finding jurisdiction over Equal Pay Act claim but dismissing because the same claim was filed simultaneously in federal district court and was barred by 28 U.S.C. § 1500); *Barnes v. Levitt,* 118 F.3d 404, 410 (5th Cir.1997), *cert. denied,* 523 U.S. 1136, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998) (District Court lacked jurisdiction over employee's Equal Pay Act claims against United States under the Tucker Act, because claims exceeded jurisdictional limits, thereby requiring action to be brought in Court of Federal Claims).[10]

### Summary Judgment In Equal Pay Act Cases

The Equal Pay Act (EPA) was enacted in 1963 as an amendment to the Fair Labor Standards Act (FLSA) and was extended to apply to the Federal Government in 1974. 29 U.S.C. §§ 201, 203(e)(2). The Equal Pay Act provides:

> Prohibition of sex discrimination
>
> (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d) (2005).

■■■ To establish a prima facie case under the Equal Pay Act, a plaintiff must demonstrate that "an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.' " *Corning Glass Works v.*

---

10. A plaintiff asserting a cause of action under the EPA must bring the action in this Court, instead of District Court, if the claim exceeds $10,000. 28 U.S.C. § 1491(a)(1); 28 U.S.C. § 1346(a)(2). Plaintiff here has not specified the amount of back pay she seeks. However, given

Plaintiff's request for pay at the SL grade, which was approximately $8,000 more than she earned annually, for several lengthy periods between September 2002 and March 2005, the Court infers that the pay Plaintiff seeks exceeds $10,000.

*Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *see Lissak v. United States,* 49 Fed.Cl. 281, 284 (2001); *Raymond v. United States,* 31 Fed.Cl. 514, 518 (1994); *Molden v. United States,* 11 Cl.Ct. 604, 610 (1987). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to show that the differential is justified under one of the Act's four exceptions: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based upon any factor other than sex.[11] 29 U.S.C. § 206(d)(1). As a general rule, the application of an exemption is an affirmative defense on which the employer has the burden of proof. *Corning Glass Works,* 417 U.S. at 196, 94 S.Ct. 2223; *County of Wash. v. Gunther,* 452 U.S. 161, 170, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

■ The employer's burden to establish an affirmative defense under the EPA is a heavy one. *See, e.g., Hauschild v. United States,* 53 Fed.Cl. 134, 139 (2002) (citing *Ellison v. United States,* 25 Cl.Ct. 481, 487 (1992) ("Merely asserting a plausible, non-gender based explanation is not sufficient.")). As the Third Circuit recognized in *Stanziale v. Jargowsky,* "[b]ecause the employer bears the burden of proof at trial, in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense 'so clearly that no rational [factfinder] could find to the contrary.'" 200 F.3d 101, 107 (3d Cir.2000) (citing *EEOC v. Del. Dep't of Health & Soc. Servs.,* 865 F.2d 1408, 1414 (3d Cir.1989)).

■ To successfully demonstrate that the pay differential is justified under one of the four exemptions, an employer must prove that the gender-neutral factor it identified is actually the factor causing the wage differential in question. *Stanziale,* 200 F.3d at 107–08. A plaintiff may "counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *See Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 526 (2d Cir.1992) ("The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices.") (citations omitted). If the factor is a mere pretext used by an employer who intended to discriminate on the basis of gender, then the affirmative defense fails. *See Kouba v. Allstate Ins. Co.,* 691 F.2d 873, 876–77 (9th Cir.1982).

As in any summary judgment context, the Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. *Id.* Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues. *E.g., Statesman II Apts. v. United States,* 66 Fed.Cl. 608, 624 (2005) (denying summary judgment because record was insufficient for Court to construe term "material differences"); *H.N. Wood Prods., Inc. v. United States,* 59 Fed.Cl. 479, 486 (2003) ("[T]he better course is to proceed to trial because the Court lacks a sufficient factual record to

**11.** The Circuits disagree on whether a pay differential under the fourth statutory defense—"any factor other than sex"—must result from a "legitimate business reason" or whether it is enough that the factor be gender-neutral on its face and bona fide. The Second, Sixth, and Ninth Circuits require proof that the differential "pay is rooted in legitimate business-related differences." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 525 (2d Cir.1992), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359; *EEOC v. J.C. Penney Co.,* 843 F.2d 249, 253 (6th Cir. 1988); *Kouba v. Allstate Ins. Co.,* 691 F.2d 873, 876 (9th Cir.1982). In contrast, the Sixth and Seventh Circuits have rejected the view that defendant must prove that the "factor other than sex" was business-related, instead requiring proof that the factor was applied in a discrimina-

tory manner or caused a discriminatory effect. *Fallon v. State of Ill.,* 882 F.2d 1206, 1211 (7th Cir.1989); *Strecker v. Grand Forks County Social Serv. Bd.,* 640 F.2d 96 (8th Cir.1980), *overruled on other grounds, Robino v. Norton,* 682 F.2d 192, 195 (1982). The Federal Circuit has not addressed this issue.

The Court need not reach this issue in resolving the instant motion because there are clearly genuine issues of material fact regarding whether Defendant's articulated reasons justified Plaintiff's pay differential. *See generally Allison v. United States,* 39 Fed.Cl. 471, 476 (1997) (determining that material issue of fact regarding the government's fourth affirmative defense precluded the government's summary judgment claim without interpreting whether the defense required a legitimate business reason).

determine whether or not the Forest Service's suspension of H.N. Wood's Contract violated the implied duty to cooperate and not hinder or was otherwise *per se* unreasonable.").

### Plaintiff's Temporary Promotion To Her Supervisor's Position: September 2002—June 2004

■ Plaintiff claims that Defendant violated the EPA by failing to pay her Senior Level pay throughout her tenure as Acting Director for Cataloging because she was performing the same duties as her male predecessor, who was paid at the Senior Level. Plaintiff served as the Acting Director for Cataloging from September 2002 until June 2004 but was only promoted to the SL pay grade for two 120–day periods during this time. Defendant contends that Plaintiff's temporary promotions to Senior Level had to be limited to 120 days per year due to gender-neutral Library regulations—not because of any gender bias. Def.'s Mot. at 16. Two regulations are implicated. First, LCR 2017–2.1, § 13, governing the Senior Executive System, provides:

> The Librarian or designee may temporarily promote employees from other pay plans into Senior Level Executive positions for a period not-to-exceed 120 days provided they meet the position's minimum qualification requirements. Temporary promotions beyond 120 days are restricted to those instances when a permanent candidate is being sought through a competitive announcement. Such temporary promotions may not exceed nine months unless preceded by a temporary promotion in which case the total amount of time spent

in a temporary promotion cannot exceed one year. If a temporary promotion is to exceed four months, the position must be posted.[12]

Second, the LOC regulation governing details provides that a "staff member may not be detailed to perform the work of a higher grade position or of a position at the same grade with known promotion potential for more than 120 days." LCR 2010–15 § 4(A), Pl.'s App. at 152–53. It appears that Defendant did not follow either regulation with respect to Plaintiff or Mr. Wiggins in that both performed the work of SL positions for more than 120 days when a permanent candidate for the SL position was not being solicited.[13] As such, Defendant has not established on this record that its purported compliance with its regulations is a factor justifying Plaintiff's disparate pay.

In addition, a genuine issue of fact exists as to whether Plaintiff should have received SL pay for a temporary promotion from September 2002 until June 2004, while she was Acting Director for Cataloging because she supervised a SL employee. Plaintiff was paid at the SL grade for only two 120–day periods even though she supervised a SL male employee, Mr. Byrum, for her entire tenure in this job. Defendant argues that the pay differential was warranted because Mr. Byrum was already being paid SL pay when Plaintiff became his supervisor. However, the record does not contain sufficient evidence showing why the LOC paid a male subordinate more than Plaintiff, his female supervisor, for at least one year and one month.[14] *Cf. Kouba,* 691 F.2d at 876–77

12. Although Defendant represents that this regulation limits temporary promotions to Senior Level positions to 120 days *per year,* the regulation itself makes no mention of such a one-year delimitation. Rather, the regulation on its face contains a blanket prohibition that temporary promotions may not exceed 120 days—not in a given year but in any amount of time. The declaration of the LOC's Director of Strategic Planning and Automation, HRS, who administered the SL pay system and has "extensive knowledge about HRS policies, procedures and regulations as they apply to Ms. Mansfield's temporary promotion," did not mention any one-year parameter. Hanratty Decl. ¶ 3, Def.'s App. at 15, and 16–19; Def.'s Reply App. at 16, 18–19. In contrast, Mr. Wiggins who supervised Plaintiff

and apparently gave her the temporary promotion, testified that "[u]nder [LOC] regulations, a staff member may only be temporarily promoted for up to 120 days *during any twelve month period."* Wiggins Decl. ¶ 8, Def.'s App. at 9 (emphasis added)

13. Further, the LOC paid Mr. Wiggins at the SL grade for more 120–day periods than it paid Plaintiff when they performed SL duties.

14. It is not clear from the record whether Plaintiff's SL salary during her two 120–day temporary promotion periods was higher than Mr. Byrum's. However, the record does indicate that Plaintiff was paid $110,472 during her first 120–

("[A]n employer might assert some business reason as a pretext for a discriminatory objective," such as "prior salary," which can "easily be used to capitalize on the unfairly low salaries historically paid to women.").

### The Library's Decision Not To Reclassify the Chief of Arts & Sciences Cataloging Division Position to Senior Level

Plaintiff claims that the LOC violated the EPA by failing to reclassify her position as Chief of the Arts & Sciences Division to the Senior Level to put her on par with a male employee who was performing the same duties. Plaintiff claims that once the classification consultant recommended that Plaintiff's position and three other Cataloging Chief positions be upgraded from GS–15 to Senior Level positions, the Library should have either increased her compensation to the Senior Level or reduced her duties to GS–15 work. Defendant argues that Associate Librarian Marcum's decision not to follow the recommendations of the classification consultant was premised on budgetary and restructuring issues, not on Plaintiff's gender. Marcum Decl. ¶¶ 7–8, Def.'s App. at 3–4.

The record does not indicate the process for the reclassification of positions at the LOC or whether the classification consultant's recommendation was correct or warranted implementation.[15] Genuine issues of material fact exist as to whether Plaintiff's position—Chief of ASCD—involved Senior Level work as the classifier recommended and should have been reclassified. If it should have been reclassified, there is an additional question of fact as to whether the Library's budget could sustain the creation of additional Senior Level positions.[16]

### The Library's Creation of Three Assistant Director Positions

In August 2004, the Library created three new Assistant Director positions, which it filled with Plaintiff and two male co-workers. Plaintiff argues that Defendant violated the EPA by paying Plaintiff less than the male Assistant Directors for performing the same work. Defendant argues that any disparity in pay between Plaintiff and the males was based on the fact that both of the males held Senior Level positions prior to taking on the Assistant Director responsibilities, not on Plaintiff's gender. This raises the same issues as the LOC's paying Plaintiff less than a male she supervised, i.e., whether the prior salary of the males was a legitimate basis to differentiate Plaintiff's pay.

Defendant further argues that the Assistant Director duties were collateral duties which did not require a position upgrade. Plaintiff maintains that her duties as Assistant Director were not collateral to her duties as Chief of ASCD, but instead, consumed the majority of her work day. The record does not sufficiently indicate what the Assistant Director duties were or what percentage of time was devoted to these duties. As such, summary judgment is not appropriate.[17]

### Conclusion

1. Defendant's Motion for Summary Judgment is **DENIED.**

---

day temporary promotion from September 2002 until January 2003, and $125,969 during her second temporary promotion from February through May 2004, and Mr. Byrum's salary was increased from $145,600 to $149,200 on January 9, 2005. Pl.'s App. at 35, 38.

**15.** It appears that expert testimony on the proper job classification for the positions at issue may be required.

**16.** The record indicates that the Library's budget has increased annually since the classification review was completed in 2003. Pl.'s App. at 85. The LOC's actual appropriation in FY 2003 was $539,469,502 and this amount increased in FY 2004 to $559,299,548. Pl.'s App.

at 85. The record further indicates that the Librarian requested FY 2004 money to improve physical security, support the Copyright Office's engineering efforts, and enhance access to the Congressional Research Service and that the Library Services' budget had to be trimmed in 2004. Def.'s Reply App. at 52, 57.

**17.** Further, the LOC Regulation on Details, LCR 2010–15, § 2.B, provides that: "assignment of substantial additional duties shall be described in a memorandum and routed through established channels for approval." Pl.'s App. at 152. The record does not indicate whether Plaintiff's additional duties were "substantial" or were or should have been approved "through established channels."

2. The Court will convene a telephonic status conference to discuss further proceedings in this action on **July 13, 2006 at 11:00 a.m. EST.** The Court will initiate the teleconference.